Kathleen Cox BAILEY, Plaintiff
and Respondent,

v.

Glade Charles BAILEY, Defendant
and Appellant.

No. 860046–CA.

Court of Appeals of Utah.

Nov. 13, 1987.

Hollis S. Hunt, Hunt & Rudd, Salt Lake City, for defendant and appellant.

Brian M. Barnard, Salt Lake City, for plaintiff and respondent.

Before ORME, BENCH and GREENWOOD, JJ.

## OPINION

BENCH, Judge:

Appellant, Mr. Bailey, seeks a redistribution of assets awarded in a divorce decree. Specifically, he challenges the award to respondent, Mrs. Bailey, of the residential property occupied by the parties during their marriage to offset the award of "his" retirement fund to him. We reverse and remand.

The parties were married in December 1967, separated in February 1983, and divorced in April 1984. Three sons were born during their marriage. At the time of the trial two were teenagers and the youngest was almost eleven years old. Mrs. Bailey was awarded custody of the children. Mr. Bailey was ordered to pay $150 per child in monthly child support.

Both the parties were employed. Mrs. Bailey worked as a school secretary and earned approximately $970 per month. Throughout the fifteen year marriage, Mr. Bailey worked as a teacher for the Jordan School District and earned, at the end of the marriage, approximately $2,300 per month. The trial court awarded no alimo-

ny.[1] Other than a few items of personal property, the only assets of value were the residential property and Mr. Bailey's retirement fund.

The only issue on appeal involves the division of the marital assets. Mr. Bailey argues that the division is inequitable because it gives Mrs. Bailey the "liquid" asset (the house) while he has only the deferred asset (the retirement fund). He seeks to have Mrs. Bailey share the retirement plan subject to the same contingencies he is subject to, namely the completion of additional years of employment with the school district, his termination of that employment, or his death.

In determining the value of the retirement fund, the court relied upon testimony of Frank Stuart, who was stipulated to be a qualified expert. Stuart testified the *cash value* of the retirement fund was approximately $23,000.[2] This is the amount Mr. Bailey would receive if he had terminated his employment at the time of the divorce.

Stuart also testified Mr. Bailey's account had a *present value* of $67,591 as of January 1984. That figure reflects all amounts paid into the fund during the marriage, both by Mr. Bailey and the school district; interest to be earned on those amounts up until distribution; the total anticipated distributions, in view of actuarial data, attributable to the appreciated contributions made during the marriage; and a discount factor to arrive at a present value of those anticipated future distributions. Stuart refined his valuation of the fund with reference to several other contingencies: study and work life expectancy statistics from the Department of Labor, an annual cost of living salary increase of four percent, and the possibility that Mr. Bailey would leave his job and find other employment.

The trial court found the present value of the retirement account to be $67,591. The court awarded the benefits of the retirement fund exclusively to Mr. Bailey and, as an offset, awarded the residential property exclusively to Mrs. Bailey.

This case involves application of principles set forth in *Woodward v. Woodward,* 656 P.2d 431 (Utah 1982). The basis for the holding in *Woodward* is the following language quoted from the landmark case of *In re Marriage of Brown,* 15 Cal.3d 838, 544 P.2d 561, 126 Cal.Rptr. 633 (1976):

> Pension rights, whether or not vested, represent a property interest; to the extent that such rights derive from employment during coverture, they comprise a community asset subject to division in a dissolution proceeding.

656 P.2d at 432. The Utah Supreme Court held that equitable distribution of the resource does not turn on whether the benefit may be used or given a present value. "The essential criterion is whether a right to the benefit or asset has accrued in whole or in part during the marriage." *Id.* at 432–33.

The Court went on to give some direction as to how retirement benefits should be distributed. In *Woodward,* the value of the retirement benefits was "contingent on the husband's decision to remain working for the government." *Id.* at 433. Because that contingency made present value of the retirement benefit "difficult if not impossible to ascertain," the Court held distribution of the asset should be postponed until "the husband chooses to terminate his government employment." *Id.*

In support of its decision to postpone distribution, the Utah Supreme Court cited with approval the case of *Selchert v. Selchert,* 90 Wis.2d 1, 280 N.W.2d 293 (Ct.App. 1979). In that case, the court reversed a distribution based on present value because of the difficulty in determining "the extent of [the earner's] interest ... until he actually retires." 280 N.W.2d at 298. The Wisconsin court explained its holding as follows:

---

1. The court found, "In light of plaintiff's current employment, her ability to support herself, and the property division herein, it is reasonable, proper and necessary that the plaintiff be awarded no alimony."

2. The trial court found the cash value to be $19,923.

This method has been used in community property states. The California Supreme Court in *In re Marriage of Brown*, 15 Cal.3d 838, 848, 126 Cal.Rptr. 633, 639, 544 P.2d 561, 567 (1976), noted:

> In dividing nonvested pension rights as community property the court must take account of the possibility that death or termination of employment may destroy those rights before they mature. In some cases the trial court may be able to evaluate this risk in determining the present value of those rights (citations omitted). But if the court concludes that because of uncertainties affecting the vesting or maturation of the pension that it should not attempt to divide the present value of pension rights, it can instead award each spouse an appropriate portion of each pension payment as it is paid. This method of dividing the community interest in the pension renders it unnecessary for the court to compute the present value of the pension rights, and divides equally the risk that the pension will fail to vest.

*Id.* at n. 7.

In *Woodward*, the Court also cited *Kikkert v. Kikkert*, 177 N.J.Super. 471, 427 A.2d 76 (1981), for the proposition that, where feasible, the trial court has the discretion to place a present value on the benefits and distribute the asset at the time of divorce. *Kikkert* suggests present value is calculable even though contingent on the life expectancy of the retiree. However, where the benefits remain subject to other contingencies, such as the possibility the pension may never mature, present value is "difficult if not impossible to ascertain." *Woodward* at 433. Where such additional contingencies are present, distribution of the asset should generally be postponed until benefits are received or at least until the earner is eligible to retire.

This interpretation of *Woodward* is consistent with a case recently decided in the Utah Court of Appeals. In *Marchant v. Marchant*, 743 P.2d 199, (Utah App.1987), this Court held the trial court erred in distributing retirement benefits at the time of the divorce rather than postponing distribution until the benefits are received. Arguably, *Marchant* is limited to federal retirement; yet the policy implications remain the same. Postponing distribution equalizes the risks and the benefits to both parties. Not only is postponed distribution generally fairer, it also allows the asset to be used by both parties in a way and at a time the asset was intended to be used: for retirement. *Id.* at 205 n. 5.

The potential for long lasting financial entanglement is a valid concern in divorce cases. *See Kikkert*, 427 A.2d at 79–80. Yet, as pointed out in *In re Marriage of Brown*, "Judicial supervision of alimony awards ... entails far more onerous a burden than supervision of future pension payment." 126 Cal.Rptr. at 640, 544 P.2d at 568. In *Marchant*, there were no direct financial entanglements between the federal retiree and the ex-spouse. In view of recent federal legislation, the long term contact between divorced parties need only be minimal under any retirement program managed by a trustee. The Retirement Equity Act of 1984, Pub.L. No. 98–397, 98 Stat. 1426 (1986), created the Qualified Domestic Relations Order ("QDRO"). When a divorce is granted, the parties can obtain from the trial court a QDRO. This order furnishes instructions to the trustee of a retirement plan and specifies how distributions should be made, to whom, and when. Although a QDRO cannot order the payment of a benefit which is not allowed under a particular plan, it can order partial payment to an alternate payee (an ex-spouse, for example). The Retirement Equity Act also simplifies the tax implications by providing that the person who actually receives the benefits is liable for the taxes. *See generally* 2 *Valuation and Distribution of Marital Property* § 42.15[3] (J. McCahey ed. 1987).

■ In summary, under our interpretation of *Woodward*, the distribution of retirement benefits should generally be postponed until benefits are received or at least until the earner is eligible to retire. That is particularly true where there is a sparsi-

ty of other divisible assets. *See Kikkert*, 427 A.2d at 80. However, the trial court retains the discretion to divide the retirement account along with other assets at the time the divorce is entered. If that discretion is exercised, the court must make specific findings as to reasons for immediate distribution. Such reasons might include, (for example), an agreement of the parties, imminency of retirement, retirement accounts not managed by a trustee, a short marriage, age differential of the parties, or unusual hostility between the parties.

■ In the instant case, the calculations of present value were based on assumptions that Mr. Bailey would continue working for the school district for another 18.7 years and that he would not die before reaching retirement age. Those contingencies make present value calculations just as difficult to ascertain in the instant case as in *Woodward*. As was ordered in *Woodward*, Mrs. Bailey is entitled to one-half of the retirement benefit accrued during the marriage. But unless the court makes specific findings as to reasons for immediate distribution, the retirement asset is not distributable until Mr. Bailey leaves his employment with the school district.

Because the trial court misapplied *Woodward*, the property award is set aside and the case is remanded for further proceedings consistent with this opinion. Since the denial of alimony referred to the property award, the court may also reconsider Mrs. Bailey's request for alimony. *See Smith v. Smith*, 738 P.2d 655 (Utah App.1987) (when altering disposition of property, trial court is not precluded from adjusting balance of decree to assure equity).

We will briefly address Mr. Bailey's additional contention on appeal that the land underlying the marital residence was his separate property. In 1970, Mr. Bailey's mother, Rachel, transferred ownership of a half acre of land to her son and daughter-in-law in joint tenancy. This land adjoined Rachel's homestead. Mr. Bailey's mother apparently intended the gift to be an advance upon her son's inheritance, but title was given to the parties jointly. The par-

ties mortgaged the property and built a home on the land, where they lived until the divorce. The trial court found the market value of the land and home to be $59,800, which included $25,000 for the value of the land, against which was an outstanding mortgage of $12,000 remaining from the original loan for construction.

■ The trial court did not find the underlying land to be Mr. Bailey's separate property, although it did acknowledge Rachel's intention that the conveyance be considered an advance on Mr. Bailey's inheritance. It is to be noted that even if the property is found to be Mr. Bailey's separate property, it is still subject to equitable division. As stated in *Burke v. Burke*, 733 P.2d 133 (Utah 1987):

> Premarital property, gifts, and inheritances may be viewed as separate property, and in appropriate circumstances, equity will require that each party retain the separate property brought to the marriage. However, the rule is not invariable. In fashioning an equitable property division, trial courts need consider all of the pertinent circumstances.

*Id.* at 135 (footnotes omitted). *See also Smith*, 738 P.2d at 658.

The property award is reversed and the case is remanded for further proceedings consistent with this opinion. No costs awarded.

GREENWOOD, J., concurs.

ORME, Judge (concurring in the result):

I am persuaded that remand and reconsideration are appropriate, in view of the confusion about ownership of the real estate and the trial court's decision not to award alimony apparently, at least in part, because of a more favorable property award than might otherwise have been ordered. *See* Note 1, *supra*. It is difficult to evaluate the trial court's decision absent detailed findings concerning alimony, *see, e.g., Marchant v. Marchant*, 743 P.2d 199, 207, (Utah Ct.App.1987), and the status of the real estate. *See generally Smith v. Smith*, 738 P.2d 655 (Utah Ct.App.1987).

However, I see no error in the court's reliance on expert testimony to fix a present value on the retirement program and I agree with the trial court that whenever it can be done—fairly and practically—immediate cash-out is to be preferred over deferred participation.[1]

As noted in the main opinion, *Woodward v. Woodward*, 656 P.2d 431 (Utah 1982), is our starting point in analyzing divorce cases posing retirement benefit issues. The Court in *Woodward* stated that if a present value of a pension plan is ascertainable, the trial court should fix the other spouse's share and have it satisfied out of other assets, leaving all pension benefits to the employee spouse. 656 P.2d at 433. The Utah Supreme Court in *Woodward* upheld a deferred arrangement only because (1) other assets available for immediate distribution were inadequate and (2) the present value of the retirement benefits was "difficult if not impossible to ascertain because the value of the benefits [was] contingent on the husband's decision to remain working for the government." *Id.* Unlike my colleagues, I read *Woodward* as preferring immediate resolution of retirement benefits whenever that can be accomplished. Deferred participation in retirement benefits by the other spouse should be a last resort.

The factors which, under *Woodward*, require a deferred arrangement were not present in the instant case. Although the present value of the retirement benefits was perhaps difficult to ascertain, it clearly was not impossible to ascertain. The trial court heard, and based its findings as to value upon, the testimony of Frank Stuart.

As Stuart testified, the Utah State Retirement Fund is set up to encourage employees to continue their employment. Consequently, only the employee's contributions are vested prior to eligibility for participation in plan benefits. Thus, if Mr. Bailey would have quit his teaching job at the time of the divorce he would have been entitled only to the vested amount. The *cash value* of the retirement fund, i.e., the vested total attributable to Mr. Bailey's own contributions, was roughly $23,000 according to Stuart.

However, since the matured fund is in the nature of an annuity, Mr. Bailey's account actually had a *present value* of $67,591 as of January 1984. As noted in the main opinion, that figure reflects all amounts paid into the fund during the marriage, both by Mr. Bailey and the school district; interest to be earned on those amounts up until distribution; the total anticipated distributions, in view of actuarial data, attributable to the appreciated contributions made during the marriage; and a discount factor to arrive at a present value of those anticipated future distributions.

---

1. The conclusion in the main opinion to the contrary is premised on, among other considerations, two factors which seem to have considerable merit: First, "[p]ostponing distribution equalizes the risks and the benefits to both parties" and is therefore fairer, and second, the difficulties of long-term financial entanglement can now be minimized through the device of a Qualified Domestic Relations Order. The problem with reliance on these factors is demonstrated in this case. The value of the benefits Mrs. Bailey will ultimately receive depends to a large extent on Mr. Bailey's *unilateral* decision to continue his present employment. If he decides to quit before his benefits are fully vested, the benefits Mrs. Bailey would receive under the formula prescribed in the main opinion would be a fraction of what she would receive under that formula if he chose to continue working long enough to achieve full vesting. A QDRO concededly avoids one form of undesirable entanglement, namely that which results when one spouse is under an obligation to write the other a check following receipt of a single monthly benefit check, with concomitant risk of tardy payments and ensuing phone calls, letters, and motions. A QDRO does not, however, avoid another form of entanglement, namely that which results when one spouse is left with a perceived need to monitor the affairs and employment decisions of the other, with concomitant risk of interference and protest if one spouse then learns that the other is contemplating a career move which will have disastrous effects on the spouse's anticipated share of benefits. Testy calls, nasty letters, and motions for modification of divorce decrees might well ensue. More generally, the risks and benefits are not really equalized with deferral where one spouse's decisions can have such a significant impact on the benefits the other will receive.

Stuart's calculation was structured to isolate marital contributions to the fund from those which would occur post-divorce and the calculation assumed compliance with the plan's requirements for eligibility. Stuart refined his valuation of the fund with reference to several other factors: study and work life expectancy statistics from the Department of Labor, a mandatory annual cost of living salary increase of four percent,[2] and the slight possibility that Mr. Bailey would leave his job and find other employment.[3]

Because the value of Mr. Bailey's retirement fund was in fact ascertained, requiring immediate cash-out of Mrs. Bailey's share would be within the court's sound discretion under *Woodward*—where apparently there was no expert testimony as to value—if there are assets with which the cash-out can be appropriately effected.[4]

Of course, the spouse who is required to cash out the other's interest in a retirement fund upon divorce should, ideally, be given the option of how best to meet that obligation. Trial courts should ordinarily not require settlement of the obligation in some mandatory way, as was done here. In addition, the spouse ought usually to have a reasonable time to discharge the obligation in situations where immediate cash-out is not possible but long-term deferral can be avoided. In *Rayburn v. Ray-burn*, 738 P.2d 238 (Utah Ct.App.1987), the trial court permitted the husband to cash out his wife's interest in five annual payments, leaving the husband the option of paying his retirement fund obligation out of current income or on some other basis. 738 P.2d at 242. In the present case, the trial court might have permitted Mr. Bailey an opportunity to cash out Mrs. Bailey's interest in payments similar to those in *Rayburn*. However, unlike the wealthy husband in *Rayburn*, Mr. Bailey's resources are quite limited and the court apparently concluded that the only method realistically available for short-term discharge of the obligation was via Mr. Bailey's equity in the residence. On remand, I believe the court should specifically consider whether some less onerous approach might achieve a short-term resolution of Mrs. Bailey's share of the retirement benefits. On the surface, divesting Mr. Bailey of his *only* "liquid" asset of any consequence—his share of the equity in the residence—seems a fairly exacting means for leaving him with the entirety of an asset which, as a practical matter, will do him no good until after the turn of the century.

In my judgment, any shift by the trial court to deferred participation by Mrs. Bailey should be the product of concern about the lack of such assets as will *fairly* permit immediate or short-term cash-out of Mrs.

2. Stuart testified that for the past five years, Mr. Bailey's salary had actually increased at eight percent per year, a trend which, if continued, would necessitate a higher present value estimate.

3. Stuart testified that "particularly in the school system, longevity is quite high and tenure is quite high. And the probability that [Mr. Bailey] would leave and seek other employment is very low." Mr. Bailey offered no testimony inconsistent with this assessment.

4. In his brief, appellant also argues that, under *Woodward*, the present valuation of a retirement plan and immediate satisfaction of the other spouse's interest therein should not be required unless "necessary criteria," such as a history of strife and hostility among the parties, are found. The main opinion gives some credence to this suggestion, contemplating "unusual hostility between the parties" as one fact which might support a decision not to defer participation, which the main opinion holds is ordinarily preferable. However, *Woodward* does not require a finding of actual animosity between the parties before the trial court can determine and award the present value of one's spouse's interest in a retirement fund. Instead, the Utah Supreme Court simply recognized that continued financial entanglement is inherently a source of strife and hostility and, thus, is best avoided. 656 P.2d at 433. "Long-term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible. This goal may be best accomplished, if a present value of the pension plan is ascertainable, by fixing the other spouse's share thereof, as adjusted for all appropriate considerations, including the length of time the pensioner must survive to enjoy its benefits, to be satisfied out of other assets leaving all pension benefits to the employee himself." *Woodward v. Woodward*, 656 P.2d at 433 (quoting *Kikkert v. Kikkert*, 177 N.J.Super. 471, 427 A.2d 76, 79–80 (1981)).

Bailey's share of the benefits, not because of trepidation about the expert's valuation or a presumption that deferral should be ordered absent specific findings pointing to the contrary. While I concede *Woodward* contains doctrinal threads supporting the underlying position taken in the main opinion as well as the position I take, I see no preference in *Woodward* for deferred participation in retirement benefits. If anything, the preference is—and should be—just the opposite.