Betty M. **GARDNER**, Plaintiff and Appellant,

v.

William James **GARDNER**, Defendant and Respondent.

No. 19246.

Supreme Court of Utah.

Jan. 4, 1988.

Pete N. Vlahos, Ogden, for plaintiff and appellant.

C. Gerald Parker, Ogden, for defendant and respondent.

STEWART, Associate Chief Justice:

Plaintiff Betty Gardner appeals from a decree awarding alimony and attorney fees in a divorce action she brought against her former husband, William Gardner. We reverse and remand for further consideration.

Mr. and Mrs. Gardner were married at Steels Tavern, Virginia, on April 17, 1950. No children were born to them, but the couple adopted two children who are now both adults. Early in the marriage, Mrs. Gardner worked full-time as a secretary while Mr. Gardner completed his medical training. Mr. Gardner also worked various jobs, and his parents provided support in the form of medical school tuition. Mrs. Gardner has not worked since 1958, when Mr. Gardner completed his medical training. Mr. Gardner is now employed as a general surgeon, earning $6,000 per month.

While married, Mr. and Mrs. Gardner acquired substantial real and personal property. Their major asset was a farm, including a home and equipment located near Eden, Utah, worth between $246,000 and $280,000. Other assets included Mr. Gardner's medical assets and retirement funds with an uncertain valuation of between $73,000 and $177,000; a contract for the sale of stock in the Ogden Clinic Investment Company; a certificate of deposit; household furniture, furnishings and fixtures; boats and automobiles; sporting equipment; and two horses and associated equipment. At the time of divorce, the

couple's only outstanding debts were a first mortgage on the family home and a loan for the purchase of one automobile.

The trial court ordered that the farm, home, and equipment be sold and the proceeds be divided equally. Until the farm was sold, Mrs. Gardner was entitled to its use, although she had to pay the mortgage, taxes, and insurance. The court also ordered that the motor vehicles and boats be sold and the proceeds divided equally, with the exception of one personal automobile for each party. The household furnishings and other items of personal property were divided roughly equally, according to personal need. Mr. Gardner was awarded his medical and business assets, including retirement funds, except Mrs. Gardner was awarded one-third of the proceeds from the sale of the Old Ogden Clinic building to pay her attorney fees. They were to share equally a money market certificate. The court granted Mrs. Gardner $1,200 per month alimony, to be reduced to $600 per month following Mr. Gardner's retirement. Mrs. Gardner was also to have a claim for $50,000 against Mr. Gardner's estate in the event that he predeceased her.

Mrs. Gardner asks this Court to reverse the judgment of the lower court. She cites *Woodward v. Woodward*, 656 P.2d 431 (Utah 1982), for the proposition that she has a spousal right to an equitable distribution of Mr. Gardner's retirement funds. She also asserts a property interest in his medical degree and business and claims that the alimony award was insufficient. Finally, she asks this Court for an award of attorney fees.

■ In a divorce proceeding, the trial court should make a distribution of property and income so that the parties may readjust their lives to their new circumstances as well as possible. *Turner v. Turner*, 649 P.2d 6 (Utah 1982); *MacDonald v. MacDonald*, 120 Utah 573, 236 P.2d 1066 (1951). Although this Court may modify decisions of the trial court, its apportionment of marital property will not be disturbed unless it is clearly unjust or a clear abuse of discretion. *Turner*, 649 P.2d at 8.

The trial court awarded Mr. Gardner his retirement account and medical assets, without placing a present value on any of those assets. The trial court called both those types of assets "futuristic" and indicated that their value would be utilized at retirement. The court did not attempt to resolve the differing valuations of the assets and provided little explanation for the award to Mr. Gardner.

Recently, in *Acton v. Deliran*, 737 P.2d 996, 999 (Utah 1987), we noted:

> Failure of the trial court to make findings on all material issues is reversible error unless the facts in the record are "clear, uncontroverted, and capable of supporting only a finding in favor of the judgment." *Kinkella v. Baugh*, 660 P.2d 233, 236 (Utah 1983). ... The findings of fact must show that the court's judgment or decree "follows logically from, and is supported by, the evidence." *Smith v. Smith*, 726 P.2d 423, 426 (Utah 1986). The findings "should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Rucker* [*v. Dalton*], 598 P.2d [1336] at 1338 [Utah 1979]. *See also Mountain States Legal Foundation v. Public Service Commission*, 636 P.2d 1047, 1051 (Utah 1981).

The trial court's statement in its findings that the retirement account and Mr. Gardner's medical assets are "futuristic" was apparently intended to mean that they could not be given a present value or should not for other reasons be taken into account. That, however, does not follow from the evidence presented at trial, nor is it supported by our cases. Regardless of how remote the full value of an asset is, it still has present value. The testimony adduced at trial devoted to differing valuations by the parties merited more precise findings.

■ In *Woodward v. Woodward*, 656 P.2d at 432, we recognized that retirement benefits, whether vested or not, are a form of deferred compensation which a court should at least consider when dividing marital assets. A right to deferred compensa-

tion acquired during marriage, or that portion of one's right to deferred compensation acquired during marriage, should not be entirely ignored in dividing assets, irrespective of when the vested funds are payable. Thus, marital property "encompasses all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived; and this includes any such pension fund or insurance." *Englert v. Englert,* 576 P.2d 1274 (Utah 1978).

However, an award of a part of a spouse's retirement funds may create significant problems. In some instances, marital assets are sparse, income is low, and an award of an equitable share of retirement assets might work a substantial hardship. Courts have, however, awarded the value of the assets on a periodic payment plan and, in some instances, have provided for payments when payout begins. This alternative should be employed only in rare instances. In *Woodward,* the Court stated:

> Long-term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible....
>
> ... [W]here other assets for equitable distribution are inadequate or lacking altogether, or where no present value can be established and the parties are unable to reach agreement, resort must be had to a form of deferred distribution based upon fixed percentages.

656 P.2d at 433 (quoting *Kikkert v. Kikkert,* 177 N.J.Super. 471, 478, 427 A.2d 76, 79–80 (1981)).

Obviously, dividing retirement or pension funds is not necessarily consistent with principles of equitable distribution in all cases. The purpose of divorce is to end marriage and allow the parties to make as much of a clean break from each other as is reasonably possible. An award of deferred compensation which ties a couple together long after divorce can frustrate that objective.

■ Nevertheless, the division of retirement funds between two persons can be accomplished when necessary. For example, in *Rayburn v. Rayburn,* 738 P.2d 238 (Utah App.1987), a physician was required to pay one-half the net present value of his retirement plan, $56,850, to his former wife in five annual installments. The court awarded present value of the share to be paid within five years to avoid "leaving the parties in a 'financial entanglement that would continue for approximately twenty or thirty years and would probably result in further court hearings and cause future animosity between the parties.'" *Id.* at 241–42. *Rayburn* provides a possible alternative for dealing with the value of the retirement account in this case. Because of the sizeable assets in this case, another alternative would be reapportionment of the property distribution to offset the value of the retirement account.

In any event, it will be necessary on remand to determine the value of the retirement account. The account has a present value of between $73,000 and $177,000, and the Court should at least consider the value of the account in making the property distribution.

Another alternative for the apportionment of property lies in the trial court's discretion to award the entire value of a solely owned professional corporation to the husband. *Dogu v. Dogu,* 652 P.2d 1308 (Utah 1982). In *Dogu,* the earning power of the corporation resulted entirely from Dr. Dogu's continuing ability to work; however, there were questions as to his ability to do so. The trial court awarded the wife savings certificates, bank accounts, and stock to offset the present liquid assets of the corporation (accounts receivable and bank accounts). The trial court did not attempt to value the future earnings potential of the corporation, presumably because of questions regarding the ability of Dr. Dogu to continue to generate income for the corporation.

■ The Ogden Clinic, of which Mr. Gardner is a member, is a well-entrenched institution, whose twenty-three members have banded together in a business organization. It is not likely to be highly susceptible to earnings interruptions because

of the ill health of one of its members. The Ogden Clinic is not entirely valueless. Mr. Gardner's share, using his own figures, is worth at least $3,826 (partnership $3,726, corporation $100). Mrs. Gardner's accountants value the business much higher. Neither gave consideration to the good will inherent in the professional clinic.[1] Mrs. Gardner was entitled to findings in support of the denial of her request for a portion of those assets. Instead, the trial court disposed of the medical assets in the same sentence in which it disposed of the retirement account.

The medical assets at issue here were not included in the retirement account, but the trial court seems to have assumed that they were one and the same. In any event, no findings of fact were made as to the value of the medical assets. The award to Mr. Gardner of his retirement funds and medical assets may be proper and equitable. However, we cannot adequately review the trial court's determinations on the basis of the sparse findings before us. Accordingly, we reverse and remand for a valuation of the medical assets and retirement accounts and reconsideration of the distribution of the marital property on the basis of those findings.

In addition, Mrs. Gardner assets an equitable and legal property interest in the medical degree of her former spouse. Whether professional degrees and professional practice constitute marital property subject to valuation and distribution upon the dissolution of a marriage has been the subject of much debate in recent years, especially in the wake of decisions where such a valuation has been made. *See, e.g., Inman v. Inman,* 648 S.W.2d 847 (Ky. 1982); *Mahoney v. Mahoney,* 91 N.J. 488, 453 A.2d 527 (1982); *O'Brien v. O'Brien,* 66 N.Y.2d 576, 498 N.Y.S.2d 743, 489 N.E. 2d 712 (1985). It has similarly been the subject of discussion in our Court of Appeals. *See Rayburn v. Rayburn,* 738 P.2d 238 (Utah App.1987); *Petersen v. Petersen,* 737 P.2d 237 (Utah App.1987).

One authority has argued that educational achievements are susceptible to valuation,[2] but there is judicial authority for the proposition that the value of an education does not fall within the common understanding of the concept of property:

> An educational degree, such as an M.B.A., is simply not encompassed even by the broad views of the concept of "property." It does not have an exchange value or any objective transferable value on an open market. It is personal to the holder. It terminates on death of the holder and is not inheritable. It cannot be assigned, sold, transferred, conveyed, or pledged. An advanced degree is a cumulative product of many years of previous education, combined with diligence and hard work. It may not be acquired by the mere expenditure of money. It is simply an intellectual achievement that may potentially assist in the future acquisition of property. In our view, it has none of the attributes of property in the usual sense of that term.

*In re Marriage of Graham,* 194 Colo. 429, 432, 574 P.2d 75, 77 (1978). *See also Mahoney,* 91 N.J. 488 at 496, 453 A.2d 527 at 531.

The cases which have refused to hold that professional degrees and practice constitute marital property subject to valuation and distribution have nonetheless assessed and divided the value of the degree

---

[1]. A marriage may be analogized to a partnership. Upon dissolution of the marital "partnership," an equitable distribution should be based on consideration of all assets, not just those that survive the trip to the bottom of the balance sheet. Where appropriate, value may be given to that "something in business which gives reasonable expectancy of preference in the race of competition," commonly known as good will. *Jackson v. Caldwell,* 18 Utah 2d 81, 85, 415 P.2d 667, 670 (1966).

The ability of a business to generate income from its continued patronage is commonly referred to as good will. Good will is properly subject to equitable distribution upon divorce. *See, e.g., Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1 (1983); *Matter of Marriage of Fleege,* 91 Wash. 2d 324, 588 P.2d 1136 (1979). *But see The Treatment of Good Will in Divorce Proceedings,* 18 Fam.L.Q. 213 (1984).

[2]. *See* Fitzpatrick & Doucette, *Can the Economic Value of an Education Really Be Measured?,* 21 J.Fam.L. 51 (1983).

or practice on the basis of other legal and equitable remedies. These cases follow a common fact pattern. Typically, the husband is supported throughout a long graduate or professional program by the working wife, and the couple is divorced soon after graduation. In such cases, there are few marital assets to distribute, and the courts have considered other ways of compensating the spouse. In a limited number of cases, the courts focus on the educational degree or professional practice. See generally *In re Marriage of Horstmann*, 263 N.W.2d 885 (Iowa 1978); *Mahoney*, 91 N.J. 488, 453 A.2d 527; *Inman*, 648 S.W.2d 847; *O'Brien*, 66 N.Y.2d 576, 498 N.Y.S.2d 743, 489 N.E.2d 712; and *Hubbard v. Hubbard*, 603 P.2d 747 (Okla.1979), for various theories of valuation.

■ We agree that an educational or professional degree is difficult to value and that such a valuation does not easily fit the common understanding of the character of property. However, at least in the present instance, we need not reach the question of whether such a valuation may ever take place. Sufficient assets distinguish this case from others in which equity and fairness required another solution. Where, as here, the marriage is of long duration, present earnings and business assets provide a more accurate measure of the true worth of the wife's investment in her husband's degree. The home, farm, automobiles, and other assets of approximately $500,000 allow for a divisible award between the Gardners. In a sense, Mrs. Gardner has realized benefits from the medical degree in the form of a greater property settlement and higher alimony. We find Mrs. Gardner's request for a property interest in Mr. Gardner's medical degree inappropriate under these facts and affirm the findings of the trial court in this regard.

■ Mrs. Gardner also claims the trial court's award of alimony was insufficient and inequitable. We agree. An alimony award should, after a marriage such as this and to the extent possible, equalize the parties' respective standards of living and maintain them at a level as close as possible to that standard of living enjoyed during the marriage. *Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985); *Higley v. Higley*, 676 P.2d 379, 381 (Utah 1983). In *Jones*, we enumerated three factors important in fixing an alimony award: (1) the financial conditions and needs of the wife; (2) the ability of the wife to produce sufficient income for herself; and (3) the ability of the husband to provide support. *Jones*, 700 P.2d at 1075. See also *English v. English*, 565 P.2d 409, 412 (Utah 1977).

Mrs. Gardner has not been gainfully employed since 1958. Though testimony indicated that she was skilled as an executive secretary, it will be difficult for her to regain these skills and become reemployed after a thirty-year absence. Mr. Gardner, by contrast, retains his career as a physician with earnings of $6,000 per month. The trial court awarded Mrs. Gardner $1,200 per month as alimony, to be reduced to $600 per month following Mr. Gardner's retirement. The court provided no explanation of the basis for the preretirement award and stated that the reduction in alimony following Mr. Gardner's retirement reflected a drop in his earning potential, Mrs. Gardner's eligibility for social security, and the fact that the house would be sold, providing Mrs. Gardner with liquid assets. We think that this award was an abuse of discretion.

Mrs. Gardner executed an affidavit prior to trial listing her monthly expenses at $1,700 per month. The trial court apparently relied on testimony at the hearing and on a prior affidavit which set her monthly needs at $1,200. Mrs. Gardner is not employed and has little prospect of being reemployed. Viewing her future earning potential and current monthly expenses, however arrived at, against that of Mr. Gardner's, we think it is clear that the award is insufficient to equalize the parties' standards of living.

Similarly, the trial court's award of $600 monthly alimony following Mr. Gardner's retirement is also unreasonably low. Mr. Gardner has substantial retirement assets. Should Mr. Gardner reach retirement age, these assets will have increased substan-

tially. Mrs. Gardner, however, has no pension and will qualify for social security payments only as an "ex-wife married over 20 years." She will not qualify for regular social security benefits until she has worked another thirty-nine quarters. Because the likelihood of her providing for her own retirement is small, we find that the trial court's award is insufficient to equalize the parties' standards of living following Mr. Gardner's retirement.

We reverse and remand for further proceedings in light of the above and in light of the factors enumerated in *Jones*, 700 P.2d at 1075. On remand, the trial court must evaluate the wife's ability to support herself based on findings and conclusions under the standards stated in *Acton v. Deliran*, 737 P.2d 996. It is not clear from the record before us that Mrs. Gardner will be able to meet her monthly needs either before or after Mr. Gardner's retirement, and this is the focus of our concern. Our review of the record therefore indicates that the alimony award may have to be increased. However, explicit findings based on the factors in *Jones* are needed to support that conclusion.

■ Finally, Mrs. Gardner asks this Court to make an award of attorney fees. The trial court made no specific award of attorney fees. However, in its findings of fact and conclusions of law, the trial court made clear that an award of a one-third interest in the Old Ogden Clinic building account and the division of the money market certificate was for the purpose of assisting the wife to pay her attorney. Mr. Gardner correctly notes that a request for attorney fees must be accompanied by evidence at trial as to the nature and amount of such fees. *See Warren v. Warren*, 655 P.2d 684, 688 (Utah 1982). No such showing was made at trial, and the findings do not support Mrs. Gardner's request. Insofar as we have approved the property settlement of the lower court, the award of attorney fees made part of that settlement is affirmed.

HALL, C.J., and DURHAM and ZIMMERMAN, JJ., concur.

HOWE, Justice (concurring and dissenting).

I concur in the majority opinion except in that part dealing with alimony. As to that part, I dissent for the following reasons.

First, in reversing and remanding for a valuation of the medical and retirement assets and a redistribution of marital property on the basis of those findings, Mrs. Gardner's financial position will undoubtedly improve and her income increase. This increase will have a direct bearing on the amount of alimony which she should be awarded. It is premature for us to now hold that the $1,200 per month or the $600 per month awarded by the trial court is inadequate. It may well be that after the redistribution of property is made, the amounts awarded will be entirely fair and could even be excessive. This is especially true as to $600 alimony after Mr. Gardner's retirement. Any amount of his retirement awarded to her on remand decreases her need for alimony and his ability to pay it. The trial judge recognized this reality when he wrote in his memorandum decision:

Upon his retirement, the alimony shall reduce to $600 per month. The reasons for this reduction are: by the time of retirement, the home should be sold and the plaintiff should have liquid assets; defendant's income will materially decrease; plaintiff will also receive some social security benefits. It is my intent in awarding to the defendant his medical assets and retirement assets that alimony shall be paid therefrom and that the plaintiff shall have a claim thereon as against the defendant's estate if he should predecease her. This claim shall be in the amount of $50,000.

Second, the $1,700-per-month alimony requested by Mrs. Gardner was based on her affidavit which listed her monthly needs at that amount, but based on her assumption that the court would allow her to continue to live on the twenty-one-acre country estate of the parties on which is a six-bedroom home with garages for four cars, a barn, and other outbuildings. Consequently, in arriving at her $1,700-per-month request, she included the monthly mortgage

payment, the property taxes, insurance premiums on that property, monthly utilities on that property, and amounts for the care of the farm animals and for farm, garden, and house maintenance and repairs. However, the trial court did not award her the country estate or allow her to permanently stay there, but ordered that the parties sell the property as soon as possible. The majority opinion does not assail this determination. The sale of the property ordered by the court necessarily eliminated many of the monthly expenses which formed a basis for the $1,700 alimony request. The trial court, therefore, acted properly in excluding those items of expense in determining a reasonable amount of monthly alimony and presumably included instead the cost of Mrs. Gardner's living in smaller and less expensive quarters. On cross-examination, Mrs. Gardner admitted that her cost of living would be less if she did not live on the estate. Thus, the $1,200 awarded by the trial court was clearly within the range of the evidence before the court. The majority does not claim that $1,200 was "clearly erroneous" as rule 52, Utah Rules of Civil Procedure, requires us to conclude before we may upset findings of fact by the trial court.

We have always accorded trial courts considerable latitude in fixing alimony. Yet here, the majority sweeps aside the trial court's judgment because it is only one-fifth of Mr. Gardner's monthly income and is insufficient to "equalize the parties' standard of living." Insofar as this writer knows, reasonable and fair alimony has never been expressed as a percentage of the husband's monthly income. This is a new concept, completely foreign to the test recognized in *Jones v. Jones,* 700 P.2d 1072 (Utah 1985), for determining an alimony award. Since the monthly income of divorced husbands is not all the same, the monthly needs and financial conditions of divorced wives vary widely, and debts and other factors have to be considered, percentages should not be employed or relied on.

Finally, I strongly dissent from the repeated references in the majority opinion that alimony is to "equalize" the financial position of the parties after their divorce. Again, this concept is contrary to the three factors to be considered which we enumerated in *Jones v. Jones, supra:* (1) the financial condition and needs of the wife, (2) the ability of the wife to produce a sufficient income for herself, and (3) the ability of the husband to provide support. We have said that the wife is entitled to enjoy as near as possible the same standard of living she enjoyed during the marriage and she should be prevented from becoming a public charge. *English v. English,* 565 P.2d 409, 411 (Utah 1977). But this is not the same as "equalizing" their incomes. The instant case is a good example. Mr. Gardner is a highly skilled surgeon earning $6,000 per month. Mrs. Gardner was not employed at the time of the divorce. She thought she could maintain the standard of living to which she had become accustomed if she received $1,700 per month alimony. If their financial positions after divorce are to be equal, she presumably should have $3,000 per month alimony. I do not think the majority intends that result.

The object of divorce is to set the parties free of each other after an equitable division of property is made and, if needed, an award of alimony is made which will enable both parties to maintain as near as possible the standard of living they enjoyed during the marriage. The parties then go their separate ways and attempt to rebuild their lives. But because of the disparity in their earning ability, the wife here, who has training as a secretary but has not been employed for thirty-three years, will never earn as much as her husband-surgeon. Our cases do not suggest that the divorce decree should attempt to cure this disparity by "equalizing" their future incomes.