**Barbara J. MOTES, Plaintiff, Appellant, and Cross–Respondent,**

v.

**Preston J. MOTES, Defendant, Respondent, and Cross–Appellant.**

No. 880015–CA.

Court of Appeals of Utah.

Nov. 16, 1989.

Rehearing Denied Jan. 29, 1990.

Kent M. Kasting (argued), Salt Lake City, for plaintiff, appellant, and cross-respondent.

David S. Dolowitz (argued), Julie A. Bryan, Cohne, Rappaport & Segal, Salt Lake City, for defendant, respondent, and cross-appellant.

Before BILLINGS, GREENWOOD and ORME, JJ.

## OPINION

ORME, Judge:

Plaintiff Barbara Motes appeals from the the trial court's entry of a divorce decree, claiming the court erred in postponing the apportionment of defendant Preston Motes's military retirement fund. Plaintiff also challenges the court's power to order her to execute the forms necessary for defendant to claim the federal tax dependency exemption for one of their children whose custody was awarded to plaintiff. This issue is the primary focus of our opinion. Defendant's cross-appeal concerns the profits generated during the marriage through his investment and management of plaintiff's inheritance. We reverse in part, affirm in part, and remand for further proceedings.

## FACTS

Plaintiff and defendant were married in 1967. At that time, defendant was three years into his career as a military officer and plaintiff was a nurse. During the marriage, defendant obtained a Masters of Business Administration degree from the University of Utah, and plaintiff secured a Bachelor of Science degree in nursing. At the time this action was filed, defendant had retired from the military and was working as a financial planner, and plaintiff was working as a nursing supervisor and attempting to obtain her Master's degree in nursing. Defendant claimed he suffered a net loss each month from his financial planning work. Plaintiff earned a monthly net income of approximately $1700.

At trial, the parties stipulated to the division of a large part of the marital property, leaving disputes primarily as to the division of defendant's military retirement benefits, which were generating payments of approximately $1500 per month; plaintiff's retirement fund, which held approximately $5100; and plaintiff's substantial inheritance and the additional funds generated through investment and growth of the inheritance proceeds.

Following trial, at which plaintiff represented herself, plaintiff was awarded custody of the children. The court awarded defendant the right to receive the full amount of his military retirement during the period in which he was to pay child support. The court reasoned that, absent this income, defendant would be unable to meet his child support obligations, which the court had set based on defendant receiving the full amount of his monthly retirement benefits. The court determined

that the final disposition of both parties' retirement accounts would be settled when defendant's child support obligations ceased, some five years hence. Plaintiff was awarded the full amount of her inheritance and the full amount of the investment income derived therefrom, and defendant was awarded the federal tax dependency exemption for one of the children.

On appeal, plaintiff argues that the court erred in awarding defendant the full amount of his monthly military retirement benefits, even though for the well-intentioned purpose of enabling defendant to satisfy his child support obligations. Plaintiff also contends the court exceeded its authority in ordering her to execute the documents necessary for defendant to claim the dependency exemption for one of the children on his federal tax return. Defendant cross-appeals, seeking a portion of those funds he claims to have generated by prudently investing plaintiff's inheritance.[1]

## I.

## RETIREMENT INCOME AND INVESTMENT PROCEEDS FROM INHERITANCE

■ The interest in a retirement plan accrued during marriage is considered a marital asset subject to equitable distribution upon divorce. *See, e.g., Gardner v. Gardner,* 748 P.2d 1076, 1078–79 (Utah 1988); *Woodward v. Woodward,* 656 P.2d 431, 432 (Utah 1982); *Dogu v. Dogu,* 652 P.2d 1308, 1310 (Utah 1982); *Greene v. Greene,* 751 P.2d 827, 830–31 (Utah Ct.App. 1988); *Maxwell v. Maxwell,* 754 P.2d 84, 86 (Utah Ct.App.1988); *Bailey v. Bailey,* 745 P.2d 830, 831 (Utah Ct.App.1987); *Marchant v. Marchant,* 743 P.2d 199, 204–05 (Utah Ct.App.1987). The best method for distributing or allocating retirement benefits or their value depends on the particular circumstances, *see Gardner,* 748 P.2d at 1079, but where possible the purpose to advance is that of "end[ing] marriage and

allow[ing] the parties to make as much of a clean break from each other as is reasonably possible." *Id.* Obviously, postponing even a decision on ultimate distribution of both retirement plans for some five years is inimical to that goal. *But see Rayburn v. Rayburn,* 738 P.2d 238, 241–42 (Utah Ct.App.1987) (cash-out of one spouse's interest in retirement fund over five-year period was acceptable where total value of retirement was substantial and installment cash-out approach was only alternative to longer entanglement).[2] Thus, as between decreeing a more immediate adjustment or simply deferring the other spouse's participation until payments are eventually received, our Supreme Court has stated that the latter "alternative should be employed only in rare instances." *Gardner,* 748 P.2d at 1079. Such instances include cases "where other assets for equitable distribution are inadequate or lacking altogether, or where no present value can be established...." *Id.* (quoting *Kikkert v. Kikkert,* 177 N.J.Super. 471, 478, 427 A.2d 76, 79–80 (1981)).

■ However, unlike all but one of the cases cited in the preceding paragraph, the instant case does not involve the difficult questions presented by retirement programs held by those still working, which will—or may—only eventually result in income. In the instant case, like in *Greene,* one spouse had already retired and his retirement benefits had ripened into monthly payments, *see* 751 P.2d at 828, the present value of which could be readily ascertained. Treatment of such benefits is less problematic than in the usual case. The present value of plaintiff's share of the now-fixed stream of income, which the benefits have become, can be readily calculated and compensated for with distribution of other assets having an equivalent value or cashed out over a comparatively short time. That failing, provision can simply be made for plaintiff to receive her share monthly, the

---

1. The record does not contain a satisfactory explanation as to why defendant's claimed financial prowess enabled him to so greatly enhance the value of plaintiff's inheritance while his professional investment activities are so unsuccessful that his expenses exceed his commissions.

2. The *Rayburn*-type treatment was endorsed in *Gardner. See* 748 P.2d at 1079.

approach taken in *Greene.* *See* 751 P.2d at 827.

Instead, the trial court in this case postponed the distribution of defendant's retirement benefits for the purpose of funding higher child support payments to plaintiff than would otherwise have been appropriate. But the net effect of such an approach is to fund defendant's support obligations through what amounts to an appropriation of plaintiff's property. It is no answer that the appropriation may be rescinded or ameliorated in five years. The retirement plans of both parties should have been treated as marital assets and definitively dealt with in the decree as part of an equitable property distribution between the parties. Accordingly, we reverse the court's treatment of both parties' retirement funds and remand for distribution in accordance with the foregoing.

The collateral effect of our reversing the trial court's handling of the parties' retirement plans is that we must also remand for reconsideration the child support award and the disposition of proceeds generated through the investment of plaintiff's inheritance. From all that appears, the court's disposition of these items was inextricably linked with its decision to deprive plaintiff of participation in defendant's retirement fund for at least five years.[3]

## II.

## FEDERAL TAX DEPENDENCY EXEMPTION

■ The most significant question this case presents is whether a divorce court has the authority to award a tax exemption to the noncustodial parent by ordering the custodial parent to execute the necessary federal tax form. Two prior decisions of this court, *Fullmer v. Fullmer,* 761 P.2d 942 (Utah Ct.App.1988), and *Martinez v.*

*Martinez,* 754 P.2d 69 (Utah Ct.App.), *cert. granted,* 765 P.2d 1277 (Utah 1988), dealt generally with the question of dependent tax exemptions in the divorce context. However, neither involved an actual order that the forms be executed. *See Fullmer,* 761 P.2d at 949–50; *Martinez,* 754 P.2d at 72. Thus, the precise issue is presented to us for the first time in this case.

### A. SECTION 152

Prior to the 1985 tax year, section 152 of the Internal Revenue Code provided that a noncustodial parent was entitled to claim a dependency exemption in any tax year where that parent paid more than $1200 toward the child's support, *and* the custodial parent "did not clearly establish that [the custodial parent] provided more support of such child ... than the parent not having custody." This rule apparently created recurring headaches for the Internal Revenue Service. The usual scenario began with a noncustodial parent who had paid more than $1200 toward the child's support, thus meeting the minimal threshold requirement under section 152. However, the parents were often in disagreement as to which of them had actually paid the majority of the child's support. It was apparently not uncommon for the dispute to be "resolved" by *both* parents claiming an exemption for the child on their respective tax returns. When this "double-dipping" was detected, the IRS was forced to audit both parents' returns and otherwise investigate to determine which one actually had paid the majority of the child's support and was therefore entitled to the dependency exemption. If nothing else, the situation amounted in an inefficient expenditure of effort by the IRS.

In 1984, Congress accordingly amended section 152 to provide that the custodial parent is *automatically entitled* to the available dependency exemptions unless he

---

3. We do not suggest that it would necessarily be inappropriate to award defendant's share of the inheritance profits to plaintiff in exchange for retirement benefits to which she would otherwise be entitled. That may well be an element of an equitable overall distribution. *See, e.g., Gardner,* 748 P.2d at 1079 (one "alternative would be reapportionment of the property dis- tribution to offset the value of the retirement account"). But the court's findings do not establish that this is what the court did here, at least not with any precision. The general question of defendant's entitlement to some part of the growth of the inherited funds is governed by *Mortensen v. Mortensen,* 760 P.2d 304, 308 (Utah 1988).

or she "signs a written declaration ... that such custodial parent will not claim such child as a dependent" and "the noncustodial parent attaches such written declaration to [his or her tax] return...." 26 U.S.C. § 152(e)(2) (1988).

The issue before us in this case is whether a state court may order the custodial parent to execute the required declaration allowing the noncustodial parent to claim the exemptions. We hold that state courts do retain their traditional authority to allocate dependency exemptions notwithstanding the 1984 amendment. Our conclusion is based on an analysis of Congress's intent in enacting the 1984 amendment; the lack of a provision explicitly divesting state courts of their consistently recognized pre-amendment authority to allocate exemptions; the significant majority of other jurisdictions holding that state courts retain such authority; and the impracticality and irrationality of a contrary ruling.

## B. CONGRESSIONAL INTENT

Prior to the 1984 amendment, it was uniformly held that state courts had authority to allocate dependency exemptions in divorce cases.[4] *See, e.g., Lincoln v. Lincoln,* 155 Ariz. 272, 746 P.2d 13, 16–17 (Ct.App. 1987); *Lorenz v. Lorenz,* 166 Mich.App. 58, 419 N.W.2d 770, 771 (1988); *Fudenberg v. Molstad,* 390 N.W.2d 19, 20 (Minn.Ct.App. 1986); *Cross v. Cross,* 363 S.E.2d 449, 456 (W.Va.1987). Thus, the amendment would have to be construed as a substantial departure from prior substantive law for one to conclude that state courts do not still have this power. This is an unreasonable construction of the amendment for two reasons.

First, the amendment does not *expressly* divest state courts of their traditional power, "and this silence demonstrates Congress's surpassing indifference to how the exemption is allocated as long as the IRS doesn't have to do the allocating." *Cross,* 363 S.E.2d at 457. Had Congress actually

intended to terminate the established practice of state courts allocating exemptions, "it is more reasonable than not to infer that ... Congress would have said so." *Id.* at 458. *See also In re Marriage of Einhorn,* 178 Ill.App.3d 212, 127 Ill.Dec. 411, 419, 533 N.E.2d 29, 37 (1988); *Wassif v. Wassif,* 77 Md.App. 750, 551 A.2d 935, 940 (1989).

Second, Congress did not intend such a result. The 1984 amendment "was meant to address the desire of the IRS not to get involved in [disputes between parents over exemptions] where it had very little, if anything, to gain by the outcome." *Wassif,* 551 A.2d at 939. The Congressional record supports that characterization of the amendment.

The present rules governing the allocations of the dependency exemption are often subjective and present difficult problems of proof and substantiation. The Internal Revenue Service becomes involved in many disputes between parents who both claim the dependency exemption based on providing support over the applicable thresholds. The cost to the parties and the Government to resolve these disputes is relatively high and the Government generally has little tax revenue at stake in the outcome. The committee wishes to provide more certainty by allowing the custodial spouse the exemption unless that spouse waives his or her right to claim the exemption. Thus, dependency disputes between parents will be resolved without the involvement of the Internal Revenue Service.

H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. II, *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 1140. Following the amendment, all the IRS need concern itself with when facing a noncustodial parent claiming an exemption is whether the custodial parent has executed the requisite declaration. *See Einhorn,* 127 Ill.Dec. at 419, 533 N.E.2d at 37. The administrative

---

**4.** The pre-amendment allocation was typically accomplished by a court order providing that the noncustodial parent be entitled to take the exemption if current in child support. The "current in child support" proviso was incorporated into the decree in this case as well, an entirely sensible condition.

ease of such a procedure is obvious, but it should be of no concern to the IRS if the declaration was executed entirely voluntarily, in accordance with a stipulated settlement, or pursuant to court order. The IRS is merely interested in the orderly administration of revenue collections, which is enhanced by doing away with the "majority of support" test. That test necessitated extensive audits by the IRS, while compliance with the signed declaration requirement can be ascertained most expediently. We are not cited to, nor have we located, any authority indicating that Congress intended the 1984 amendment to divest state courts of their traditional authority and bestow a collateral economic benefit on custodial parents. Nor can we identify any legitimate policy reason for Congress to assert an interest in the division of what is tantamount to marital property, a task traditionally reserved under our federal system for each state's domestic relations courts.

In sum, the amendment was merely intended to enhance the administrative convenience of the IRS, not to interfere with state court prerogatives.[5] *See, e.g., Fudenberg v. Molstad,* 390 N.W.2d 19, 21 (Minn.Ct.App.1986); *In re Marriage of Milesnick,* 765 P.2d 751, 754 (Mont.1988); *Pergolski v. Pergolski,* 143 Wis.2d 166, 420 N.W.2d 414, 417 (Ct.App.1988).

### C. CASE AUTHORITY

The vast majority of other jurisdictions to confront the issue have concluded that state courts retain the authority to order the custodial parent to execute the declaration contemplated by the 1984 amendment. 15 Fam.L.Rep. (BNA) 1335 (May 16, 1989);

*In re Marriage of Milesnick,* 765 P.2d at 754. *See Lincoln v. Lincoln,* 155 Ariz. 272, 746 P.2d 13, 16–17 (Ct.App.1987); *In re Marriage of Einhorn,* 178 Ill.App.3d 212, 127 Ill.Dec. 411, 417–19, 533 N.E.2d 29, 35–37 (1988);[6] *In re Marriage of Lovetinsky,* 418 N.W.2d 88, 90 (Iowa Ct.App. 1987); *Wassif v. Wassif,* 77 Md.App. 750, 551 A.2d 935, 939–40 (1989); *Fudenberg v. Molstad,* 390 N.W.2d 19, 21 (Minn.App. 1986); *McKenzie v. Jahnke,* 432 N.W.2d 556, 557 (N.D.1988); *Hughes v. Hughes,* 35 Ohio St.3d 165, 518 N.E.2d 1213, 1214–16, *cert. denied,* —— U.S. ——, 109 S.Ct. 124, 102 L.Ed.2d 97 (1988); *Cross v. Cross,* 363 S.E.2d 449, 456–60 (W.Va.1987); *Pergolski,* 420 N.W.2d at 417. *See also Jensen v. Jensen,* 753 P.2d 342, 345 (Nev.1988) (per curiam) (a custodial parent can be ordered to execute a "waiver" of dependency exemption, but only if a similar result cannot be achieved by adjusting alimony and child support to achieve after-tax financial parity).

We find *Hughes,* 518 N.E.2d at 1214–17, to be particularly compelling. In *Hughes,* the sole issue on appeal was identical to the major issue before us here. The majority considered at length the purpose for the 1984 amendment and concluded it was

> made for the administrative convenience of the Internal Revenue Service. A domestic relations court has broad discretion to determine the proper mix and allocation of marital assets and property rights in a divorce proceeding.... We find nothing in the legislative history of the [1984 amendment] to support [the] theory that new Section 152 was meant to encroach upon this exclusive statutory power of state courts.... The only con-

---

5. It is noteworthy that Congress, motivated by a desire to minimize administrative problems for the IRS, tailored its amendment to reflect a presumption that in the typical case, the custodial parent will indeed be the one providing most support. If it assumed the routine situation would be otherwise, Congress would have provided that the noncustodial parent would be entitled to the exemptions absent a declaration from the custodial parent.

6. It appears that two divisions of the Illinois Court of Appeals have split on this issue. *See In re Marriage of Emery,* 179 Ill.App.3d 744, 128

Ill.Dec. 569, 573, 534 N.E.2d 1014, 1018 (1989). The analysis in *Einhorn* is much more compelling. *Einhorn* carefully analyzes both sides of the issue. *Emery,* on the other hand, disposes of the issue in one conclusory paragraph, without even acknowledging the previously decided *Einhorn* opinion or the weight of authority to the contrary. Additionally, it is not clear that the trial court in *Emery* had actually *ordered* the custodial parent to execute the necessary declaration. *See* 128 Ill.Dec. at 573, 534 N.E.2d at 1018.

cern of the IRS, evident from the history surrounding the changes, is that only one divorced spouse claim and receive the deduction.

*Id.* at 1215–16. In contrast, the *Hughes* dissenters argued that section 152 requires a *voluntary waiver* by the custodial parent, not one compelled by court order. *Id.* at 1217 (Wright, J., dissenting). Although one can only infer the basis for the Supreme Court's denial of certiorari, — U.S. ——, 109 S.Ct. 124, 102 L.Ed.2d 97 (1988), it may be significant that section 152 is not couched in terms of a "waiver," but only of a "declaration."[7]

The Minnesota Court of Appeals has had several opportunities to pass on this issue and consideration of those cases is also instructive. In *Valento v. Valento,* 385 N.W.2d 860, 863 (Minn.Ct.App.1986), the court of appeals held that a lower court had not abused its discretion in refusing to order the custodial parent to execute a section 152 declaration. *Id.* However, by considering the refusal on its merits instead of simply holding the lower court had no authority to do otherwise, the court of appeals implicitly concluded that state courts do have authority to allocate dependency exemptions notwithstanding the 1984 amendment. This position was clarified by the court a few months later in *Fudenberg v. Molstad,* 390 N.W.2d 19 (Minn.Ct.App. 1986). In that case, the court first analyzed the legislative history of the amendment and, citing *Valento,* concluded that "[s]tate court allocation of the exemption does not interfere with Congressional intent.... Thus, allocation of the exemption is permissible." 390 N.W.2d at 21. Accordingly, the case was remanded to the lower court which had previously ruled it had no authority to allocate the exemption. *See also Theroux v. Boehmler,* 410 N.W.2d 354, 358 (Minn.Ct.App.1987) (because trial court did not expressly order custodial spouse to execute waiver, its allocation of

the dependency exemptions to noncustodial spouse was ineffective); *Gerardy v. Gerardy,* 406 N.W.2d 10, 14 (Minn.Ct.App.1987) (same); *Thesing v. Thesing,* 390 N.W.2d 469, 472 (Minn.Ct.App.1986) (trial court erred in holding it had no power to require custodial spouse to execute declaration; case remanded for reconsideration).

There is admittedly a split of authority on this question and a minority of courts considering the issue have held that the 1984 amendment divests state courts of their traditional authority to allocate dependency exemptions and that state courts may not order custodial parents to execute section 152 declarations. 15 Fam.L.Rep. (BNA) 1335 (May 16, 1989). *See McKenzie v. Kinsey,* 532 So.2d 98, 100 (Fla.Dist.Ct. App.1988); *Lorenz v. Lorenz,* 166 Mich. App. 58, 419 N.W.2d 770, 771–72 (1988); *Gleason v. Michlitsch,* 82 Or.App. 688, 728 P.2d 965, 967 (1986); *Sarver v. Dathe,* 439 N.W.2d 548, 551–52 (S.D.1989); *Davis v. Fair,* 707 S.W.2d 711, 717–18 (Tex.Ct.App. 1986). Cases following the minority view are unpersuasive for at least two reasons.

First, these cases recognize, as they must, that a dependency exemption generally provides a financial benefit to the parent entitled to claim it in the form of reduced income taxes. *See, e.g., Sarver,* 439 N.W.2d at 552. Thus, courts must consider which parent will receive this benefit in setting child support and alimony. At least three courts have even gone so far as to *remand* cases where the exemption was held on appeal to have been improperly awarded to the noncustodial parent, recommending that the trial court *reduce* the previously awarded child support and alimony in light of the noncustodial parent's loss of this financial benefit. *See Lorenz,* 419 N.W.2d at 772; *Sarver,* 439 N.W.2d at 552; *Davis,* 707 S.W.2d at 718. This result, while unavoidable under the minority view, is bizarre, with dependent children the ultimate victims. As pointed out quite

---

7. There are at least three reasons for the Supreme Court to have granted certiorari in *Hughes* if it felt the case was wrongly decided. First, the case exclusively involves the interpretation of federal law; second, a few state courts have adopted a different interpretation, one consistent with that espoused by the dissenters in *Hughes,* thus creating a split in authority; and third, the issue involves substantial policy questions and implicates the division of power under our federal scheme.

convincingly in *Cross*, 363 S.E.2d at 458–59, the minority view forces state courts to achieve financial parity indirectly, by downwardly adjusting otherwise appropriate alimony and child support, rather than achieving parity directly, by sensibly allocating the exemptions.

Second, these cases are lacking in thoughtful or disciplined analysis. For example, the Florida Court of Appeals rejects *Cross* and its progeny because "deductions and exemptions ... are not to be extended beyond the clear import of the language used." *McKenzie*, 532 So.2d at 100 n. 3. However, as pointed out above, section 152 merely grants the noncustodial parent the right to an exemption if he or she secures a declaration from the custodial parent. Section 152 is absolutely silent as to whether or not state courts may *direct* the custodial parent to execute the declaration as part of its overall disposition. Thus, the *McKenzie* court offends the very theory it purports to uphold by imposing prohibitions on state courts which are not expressly or impliedly imposed by section 152.

Similarly, in *Gleason*, 728 P.2d at 967, the Oregon Court of Appeals concludes, without analysis, that "[i]n the circumstances here, the court should not have designated which party would receive the dependency exemption." *Gleason* obviously ignores the rationale of the more recent cases rejecting its conclusion, and in this light, its one-sentence, conclusory holding is not very compelling. Finally, we find Justice Neely's criticism of *Davis*, 707 S.W.2d 711, to be perceptive, as well as colorful. *See Cross*, 363 S.E.2d at 458–60. Justice Neely concludes that *"Davis v. Fair* is an extremely formalistic opinion that strains at a gnat but swallows a camel." 363 S.E.2d at 458.

## D. PRACTICAL CONSIDERATIONS

State divorce courts must always recognize the financial benefit accompanying dependency exemptions when awarding alimony and child support. However, income tax exemptions are only valuable to persons with income, and up to a certain point, the higher the income the more valuable

the financial benefit, given the progressivity of the federal income tax. *Cross v. Cross*, 363 S.E.2d 449, 460 (W.Va.1987). Prohibiting state courts from allocating the available exemptions to the parent receiving the greatest economic benefit often results in the unnecessary depletion of limited family resources.

Thus, use of the power to order a custodial parent to execute a section 152 declaration should not be used to evenly or otherwise divide the available exemptions without regard to the particular economic realities. On the contrary, it should be limited to those situations where the noncustodial parent has the higher income and provides the majority of support for the child or children whose exemption is claimed—support at a level which can be increased as a result of a reduction in his or her tax burdens. Indeed, it would be an abuse of discretion for a divorce court to order a custodial parent to sign the declaration in the absence of appropriately supported findings to that effect or demonstrating other exceptional circumstances making it in the best interest of the parties and their children that the declarations be signed. The declarations are not to be used as a kind of "consolation prize" for parents who are losing daily association with their children. Moreover, by ordering the custodial parent to execute the declaration, the court actually gives the custodial parent a tool to compel timely support payments. The court's order should provide that the duty to execute the declaration at the end of each year is contingent on the noncustodial parent being current in support payments. *See also* note 4, *supra*. The custodial parent may then rightfully refuse to execute the declaration if support payments are owing, thereby creating an economic incentive for the noncustodial parent to comply with his or her support obligations.

As observed in *Sarver*, "[t]his is not a question ... of 'overrid[ing]' federal tax law' or 'unconstitutional meddling with Congressional authority.' It is simply a matter of determining and preserving the most resources in situations of obvious lim-

ited resources." 439 N.W.2d at 554 (Sabers, J., specially concurring).

## E. CONCLUSION

In summary, we conclude the 1984 amendment to section 152 does not divest state courts of their traditional power to allocate federal tax dependency exemptions, and state courts have the power to order a custodial parent to execute a declaration in favor of the noncustodial parent. The contrary position followed by only a minority of jurisdictions was not intended by Congress, especially given the lack of an express termination of the traditional approach of state courts to dependency-exemption allocation. Finally, the practical effect of a contrary ruling would essentially prevent state courts from taking permissible advantage of progressive tax brackets and maximizing the resources available to support divorcing parents and their families. All of that having been said, the power to order execution of a section 152 declaration should be cautiously and prudently used, with the sole objective of maximizing the financial resources available to the "family" unit.

The court in this case had the requisite judicial power to direct plaintiff to execute the section 152 declaration for defendant's benefit as an aspect of its overall property distribution. Whether or not that disposition was an appropriate exercise of discretion need not be decided in view of the extensive reassessment of property and support questions which will occur on remand. In the process of that reassessment, appropriate disposition of the tax exemptions, and the question of any related orders concerning execution of section 152 declarations, will depend on the economic realities which emerge and must be in accordance with the views expressed in this opinion.

The parties shall bear their own costs and attorney fees incurred on appeal.

BILLINGS and GREENWOOD, JJ., concur.