2006 UT 65

**STATE of Utah, Plaintiff and Petitioner,**

v.

**James L. ROBISON, Defendant and Respondent.**

No. 20050257.

Supreme Court of Utah.

Oct. 31, 2006.

Mark L. Shurtleff, Att'y Gen., Matthew D. Bates, Asst. Att'y Gen, Salt Lake City, for petitioner.

Milton T. Harmon, Nephi, for respondent.

NEHRING, Justice:

¶ 1 We agreed to review the court of appeals' decision to vacate James Robison's guilty plea for writing a bad check.[1] We hold that the court of appeals erred when it used an unpublished memorandum opinion to release Mr. Robison from his guilty plea for a reason never raised by the parties. The court of appeals interpreted the bad check statute to require that the check be given as part of a "substantially contemporaneous exchange." We hold that a bad check may be written where no "substantially contemporaneous exchange" occurs and that Mr. Robison's admitted conduct satisfies the statutory elements of the offense. Thus, we remand to the court of appeals for consideration of Mr. Robison's remaining rule 11 claims.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2 James Robison is a licensed motor vehicle dealer. In the fall of 2001, a customer was looking for a GMC pickup truck. Mr. Robison contacted another dealer, Randy Painter, who found and purchased a truck that met the customer's specifications. Mr. Robison picked up the truck from Mr. Painter on September 1, 2001, and showed it to his customer later that day. The customer approved of the truck and agreed to buy it.

¶ 3 Mr. Robison then called Mr. Painter, told him that his customer was purchasing the truck, and committed to send Mr. Painter a check for the purchase price. Mr. Painter received a check from Mr. Robison several weeks later. It bounced.

¶ 4 Shortly thereafter, Mr. Robison faxed Mr. Painter a copy of a receipt showing that he had deposited a second check into Mr. Painter's bank account. Believing that the check would be honored, Mr. Painter mailed the truck's title to Mr. Robison, but the second check bounced as well. Mr. Robison never paid for the truck, although his customer paid him.

¶ 5 The State charged Mr. Robison with two counts of issuing a bad check and one count of theft by deception. Under the terms of a negotiated plea agreement, Mr. Robison pled guilty to one count of issuing a bad check.

¶ 6 One month later, Mr. Robison moved pro se to withdraw his guilty plea. The court denied this motion. In its order dismissing Mr. Robison's motion, the court found that the plea colloquy between the court and Mr. Robison satisfied the requirements under rule 11 of the Utah Rules of Criminal Procedure.

¶ 7 Mr. Robison appealed. He claimed that the district court failed to comply with rule 11 when it took his plea because elements of the offense to which he was pleading guilty were never clearly communicated, because he did not admit to the elements of the offense, and because the written plea agreement was not clear and consistent.

¶ 8 The court of appeals did not directly address Mr. Robison's claims, but a divided panel ruled in a memorandum decision that the plea violated rule 11 because it lacked an adequate factual basis to justify finding Mr. Robison guilty. The court of appeals majority determined that the checks written by Mr. Robison were not part of a "substantially contemporaneous exchange" and that his issuance of the checks to Mr. Painter was not a crime.

¶ 9 The court of appeals acknowledged that Mr. Robison "did not adequately present this issue to either the district court or to [the court of appeals]," *State v. Robison*, 2005 UT App 9U, *1–2, 2005 WL 91251 *1, but nevertheless based its holding on the "substantially contemporaneous exchange" rationale "to avoid 'a great and manifest injustice.'" *Id.* (quoting *State v. Pierce*, 655 P.2d 676, 677 (Utah 1982)).

## ANALYSIS

I. THE COURT OF APPEALS DID NOT HAVE THE DISCRETION TO REVERSE THE DISTRICT COURT BASED ON REASONING OF ITS OWN MAKING

¶ 10 Before the phrase appeared in the court of appeals' memorandum decision,

---

1. Utah's bad check statute is found in Utah Code section 76–6–505 (2003).

neither the State nor Mr. Robison had mentioned the notion of a "substantially contemporaneous exchange." The court of appeals justified its unbidden decision to read a "substantially contemporaneous exchange" requirement into section 76–5–505 by explaining that, had it not done so, Mr. Robison would have been the victim of a "great and manifest injustice."

¶ 11 The phrase "great and manifest injustice" was first introduced into Utah case law in *State v. Pierce*, 655 P.2d 676, 677 (Utah 1982). Ms. Pierce claimed that she had been " 'compelled to give evidence against [her]self' " in violation of article I, section 12 of the Utah Constitution. *Id.* (quoting Utah Const. art. I, § 12). She had, however, failed to raise this issue in the trial court when the allegedly self-incriminating evidence was introduced. We therefore refused to consider her claim because it was not properly preserved. *Id.* We nevertheless mentioned that "the facts [in Ms. Pierce's case] are not such that great and manifest injustice would be done if this Court does not entertain the issue sua sponte as an exception" to the preservation rule. *Id.*

¶ 12 Before being invoked by the court of appeals in aid of Mr. Robison, *Pierce's* "great and manifest injustice" language had appeared in only two other Utah cases. In both instances, the defendants tried to introduce legal claims that they had not preserved; and in both instances, the appellate court refused to grant relief from the failure to preserve an issue based on the presence of a "great and manifest injustice." *State v. Lesley*, 672 P.2d 79 (Utah 1983); *State v. Archambeau*, 820 P.2d 920 (Utah Ct.App. 1991).

¶ 13 *Pierce, Lesley,* and *Archambeau* shared features common to most efforts to avoid the consequences of the claim preservation rule which mandates that "claims not raised before the [district] court may not be raised on appeal." *State v. Cram*, 2002 UT 37, ¶ 9, 46 P.3d 230 (internal quotation marks omitted). The defendants in these cases discovered a ground for error they believed to justify their position and attempted to persuade the appellate court that circumstances warranted application of an exception to the preservation rule.

¶ 14 The most common exception to the preservation rule is plain error.[2] "To establish plain error, [a defendant is] required to demonstrate that (i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Cruz*, 2005 UT 45, ¶ 16, 122 P.3d 543 (internal quotation marks omitted). In the *Pierce* trio of cases, like many others in the failure to preserve canon, the defendants articulated the unpreserved issue and explained why the district court committed "plain error" by not recognizing the magnitude of the error and by not stepping in on its own to avoid or remedy it. In this case, the court of appeals, however, went considerably further in rescuing Mr. Robison when it took the initiative to identify the issue that rendered Mr. Robison's conviction a "great and manifest injustice."

¶ 15 Whether the bad check statute included a "substantially contemporaneous exchange" element had never been briefed or argued by the parties. Until the time that the court of appeals grounded its holding in this concept, it had remained well enough concealed that neither party had noticed its potential for any claim of error, much less plain error.

¶ 16 The "substantially contemporaneous exchange" requirement was never subjected to the rigors of the adversarial process. Any skeptical scrutiny that the interpretation was forced to endure came from within the court itself. This is not to say that the court of appeals cannot be counted on to perform penetrating critical thinking. It clearly can and does. What troubles us about the approach of the court of appeals is the exercise

---

2. We also note that we have previously stated "that in most circumstances, the term 'manifest injustice' is synonymous with the 'plain error' standard." *State v. Verde*, 770 P.2d 116, 121–22 (Utah 1989). We do not address whether the language in *Pierce* creates an exception distinct from plain error. For a more comprehensive analysis of the preservation rule in Utah jurisprudence, see *State v. Holgate*, 2000 UT 74, ¶¶ 11–17, 10 P.3d 346.

of critical thinking without the engaged participation of the parties whose affairs will be directly affected by the product of that thinking.

¶ 17 Although we have used the vocabulary of preservation to describe the court of appeals' methodology, the analogy is not especially apt. Because the preservation rule and its exceptions do not contemplate arguments that are never presented by the parties, preservation nomenclature is inadequate to explain or assess what went awry here.

¶ 18 Because an exception to the preservation rule is insufficient to justify the court of appeals' decision, we next explore whether any other appellate principle would justify reversing the district court by invoking new law based on a theory that has not been raised by the parties.

¶ 19 Like almost every appellate court, we approve of the practice of affirming a lower court on alternative, unbriefed grounds. 5 C.J.S. *Appeal & Error* § 714 & nn. 40–43 (1993). We have said that

> an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the [district] court to be the basis of its ruling [and] even though such ground or theory is not urged or argued on appeal by appellee, was not raised in the lower court, and was not considered or passed on by the lower court.

*Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (internal quotation marks omitted).

¶ 20 While most jurisdictions have opined on the question of affirming on alternative grounds, the propriety of reversing a lower court on alternative grounds has received almost no attention, including none from this court. Perhaps the reasons why appellate courts should resist reversals for reasons of their own invention are too obvious to have merited serious inquiry. The most prominent, and perhaps only, reason to apply the same standards for alternative ground reversals as affirmances is symmetry. Arguments based on symmetry have a superficial appeal because they appear to be linked to equal treatment and thus to fundamental fairness. But more often than not, symmetry is quickly exposed as a false prophet of fairness. This is one such case.

■ ¶ 21 To permit concerns over symmetry to overcome all other considerations in the formulation of an alternative grounds doctrine would be to abandon the presumption, critical to the functional relationship between district courts and appellate courts, that a lower court has conducted its affairs properly and that the outcome of its process is sufficiently supported in law and fact. This "presumption of regularity" is a firmly embedded appellate doctrine. Under the presumption of regularity, "Utah courts place the initial burden on the appellant, not on the state, to produce some evidence that the prior conviction was improper, attaching a presumption of regularity, including a presumption of constitutionality, to the prior conviction." *State v. Cravens*, 1999 UT App 156U, *2, 1999 WL 33244680 *1. The presumption is a natural complement to the adversarial system. Losing in court comes with consequences. One of those consequences is the reordering of burdens between the parties when the scene shifts from the trial to the appellate arena. It falls squarely upon an appellant to surmount the filing, briefing, and persuasion burdens associated with an appeal. Much of this has to do with the presumption of regularity. An appellant must do the heavy lifting because the law otherwise presumes that all was well below. An appellate court that does the lifting for an appellant distorts this fundamental allocation of benefits and burdens.

■ ¶ 22 We agree, then, with the pronouncement of the Illinois Supreme Court that "[o]ther than for jurisdictional reasons [the court of appeals] should not normally search the record for unargued and unbriefed reasons to reverse a [district] court judgment." *Saldana v. Wirtz Cartage Co.*, 74 Ill.2d 379, 24 Ill.Dec. 523, 385 N.E.2d 664, 667 (1978).

¶ 23 Of course, not every case is "normal." What should an appellate court do when it holds in its hand an argument that is tantamount to the legal royal flush? By refusing, out of principle, to reverse an astonishingly

erroneous but undetected ruling, a court could subject the losing party, especially a defendant in a criminal case,[3] to "great and manifest injustice." It is not at all unusual for an appellate court judge to experience an epiphany (or at least what she believes to be an epiphany) during her journey into a brief or appellate record. Such a phenomenon often captures an insight that the parties bypassed. That these epiphanies seldom lead to reversals suggests that however profound the insight might appear, there is one insight that trumps it: that any episode of unexpected and extraordinary judicial wisdom should be treated with suspicion and subjected to close scrutiny.

¶ 24 There are several ways appellate courts can test a notion of their own invention before using it to justify a reversal, most notably by inviting supplemental briefing. We approved this approach in *State v. Breckenridge*, 688 P.2d 440 (Utah 1983). Mr. Breckenridge had pleaded guilty to arson charges, which required "intentionally ... damag[ing][a] habitable structure ... by means of fire." *Id.* at 441. Despite his guilty plea, Mr. Breckenridge repeatedly insisted that he had intentionally started the fire to dispose of trash and that the fire burned the building only after it got out of control. However, it did not occur to Mr. Breckenridge or his counsel that his state of mind constituted a defense to the crime. *Id.* at 441–42. After repeatedly failing to raise this serious flaw in the guilty plea, *"[o]n the suggestion of this Court,* during oral arguments on the appeal, [Mr. Breckenridge] addressed for the first time the argument that ... his guilty plea was accepted by the court ... without showing that there was any fac-

tual basis upon which to base a conviction of a crime." *Id.* at 443 (emphasis added). We recognized that the briefing overlooked a compelling argument that, if presented, would likely merit reversal of Mr. Breckenridge's conviction. Rather than succumbing to the temptation to trust without examination the quality of our insight and reverse, we honored the adversarial process and invited the parties to address the question of whether Mr. Breckenridge's actions satisfied the elements of arson.[4]

¶ 25 We therefore hold that the court of appeals erred when it based its decision on an unargued legal theory.[5] If this court agreed with the court of appeals that a "great and manifest injustice" would befall Mr. Robison were he not allowed to present the argument that the bad check statute requires a "substantially contemporaneous exchange," it would then be appropriate for this court to remand the case for arguments on the merits of the substantive meaning of section 76–6–505. Remand for this purpose, however, is unnecessary.

## II. THE COURT OF APPEALS INAPPROPRIATELY ISSUED ITS DECISION IN MEMORANDUM FORM

¶ 26 Our review in this case has been made more difficult because it comes to us in the form of an unpublished memorandum decision. Unpublished memorandum decisions have an important, but limited, role in the work of the court of appeals. *See, e.g., Grand County v. Rogers*, 2002 UT 25, ¶¶ 7–19, 44 P.3d 734.

---

**3.** We note that "great and manifest injustice" sufficient to spur an appellate court to raise unpresented arguments is only possible in the criminal context when the deprivation of personal freedoms is at stake. In the civil context, the interest in procedural regularity will always outweigh any injustice a party might face from losing a case despite valid yet unargued authority to the contrary.

**4.** If an appellate court discovers the unbriefed legal argument prior to oral arguments, it could ask for supplemental briefing and consider changing the argument schedule, if necessary. If the novel theory occurs to a judge during the course of arguments, it would be wise to pose the

question to the parties and subsequently request additional briefing. Even if the theory is uncovered after arguments, in the final stages of opinion drafting, the court should allow the parties the chance to weigh in on its validity through supplemental briefing.

**5.** As a court of last resort, we have the authority to decide on whatever grounds we deem appropriate, regardless of preservation or presentation. Naturally, we have an obligation to exercise this prerogative cautiously and rarely, as the interests of justice suggest that we should follow our own advice and permit the parties the opportunity to present arguments.

¶ 27 "Memorandum decisions are intended to address cases which do not present novel issues of law on appeal, with reference to well-established precedent arising either from case law or from unambiguous statutory language." *Id.* ¶ 7. Frequently, such opinions are not published because they apply the law but do not develop it and therefore are of interest only to those with a stake in the outcome. *Id.*

¶ 28 Although the task of taking on appeals that result in correction of error falls primarily to the court of appeals, that court frequently confronts cases featuring novel questions of law. *Id.* ¶¶ 10–11. In those cases, the court's work should appear in a published opinion.

¶ 29 There are two primary reasons for this. First, the parties to an appeal are "entitled to an understanding of the reasons relied upon by the appellate court." *Id.* ¶ 14. This is more easily accomplished in cases that are suited to memorandum decisions because "[w]hen the appellate court [cites] to clear precedent that is . . . applicable to the situation presented for review, the parties may know of the reasoning without the need of the appellate court reiterating previously well defined law." *Id.*

¶ 30 Second, "our review is made much more difficult" when "the reasoning of the court of appeals is abbreviated, or superficial, or incomplete." *Id.* ¶ 15. Without a clear explanation from the court of appeals, both the parties and this court are left to guess at the precise reasoning employed by the court of appeals. Such a situation hinders greatly the efficacy of certiorari review because it eliminates the ability of counsel and court to analyze and dissect a single, specific, well-defined legal theory.

¶ 31 Furthermore, because it is important that the basis for a decision is clearly understood, reversal or affirmance of the district court on other grounds should almost never be done through a memorandum decision. "In matters where the lower court is reversed, in whole or in part, or affirmed on other grounds, more explanation is usually necessary." *Id.* ¶ 18. The only exception would be "in those rare instances where the reasons for reversal [or affirmance on other grounds] are clearly set forth in prior case law." *Id.*

¶ 32 We also note that in a case such as this that stimulates a dissent, the use of a memorandum decision is likely unwise. The existence of a dissent illustrates that there are concerns with the logic applied that deserve more than a cursory explanation.[6]

¶ 33 Applying the foregoing observations to this case, we are convinced that the memorandum decision was not the proper decisional format.

III. THE COURT OF APPEALS INCORRECTLY INTERPRETED UTAH'S BAD CHECK STATUTE AS REQUIRING A CONTEMPORANEOUS EXCHANGE

¶ 34 Finally, we turn away from procedural concerns to the merits of the court of appeals' statutory interpretation. As part of the grant of certiorari, this court agreed to take up the question of whether section 76-6-505 requires a "substantially contemporaneous exchange." Our statutory analysis of section 76-6-505, leads us to conclude that one may commit the crime of passing a bad check without engaging in a "substantially contemporaneous exchange."

¶ 35 The statute at issue here is Utah's bad check statute. Utah Code Ann. § 76-6-505 (2003). The provision reads, in relevant part, "Any person who issues . . . a check . . . for the purpose of obtaining from any person . . . any money, property, or other thing of value . . . knowing it will not be paid by the drawee and payment is refused by the drawee, is

---

6. The use of a memorandum decision where a full opinion would be appropriate under the preceding analysis is not grounds for a reversal of the court of appeals. It is a rule of convenience and consideration for this court and for the parties, but does not constitute a due process violation affording reversal or remand. There may be occasion where remand to the court of appeals for a complete opinion may be appropriate, but such a determination is entirely up to this court's discretion and will be used only when necessary. *Grand County v. Rogers*, 2002 UT 25, ¶ 15, 44 P.3d 734.

guilty of issuing a bad check...." *Id.* § 76-6-505(1).

¶ 36 During the plea colloquy, Mr. Robison emphasized that the truck had been delivered several weeks before he sent Mr. Painter the bad check. The court of appeals seized on this point. It reasoned that because Mr. Robison received the truck before issuing the bad check, he did not issue the check "for the purpose of obtaining" anything—that is, he had already obtained the thing of value. To be unlawful, the passing of the bad check must bear the hallmarks of a *quid pro quo* for money, property, or some other thing of value. The court of appeals viewed temporal proximity between the passing of the check and the acquisition of value as the essential measure of the check writer's purpose. In the court's view, the elapsed time between the delivery of the truck and the passing of the check was too long to establish the necessary link between the check and the truck. Only a "contemporaneous exchange" would do.

¶ 37 The court of appeals' determination that the statute included a "contemporaneous exchange" requirement was significant because rule 11(e)(4)(A) of the Utah Rules of Criminal Procedure requires that a guilty plea be an admission to all of the elements of the offense to which the plea is entered. By interpreting the statute to require a contemporaneous exchange, the court of appeals determined that Mr. Robison's plea did not include facts sufficient to establish the crime to which he had pleaded guilty. That determination mandated reversal under rule 11.

¶ 38 In finding that the statute required a "substantially contemporaneous exchange," the court of appeals relied upon logic from *Howells, Inc. v. Nelson*, 565 P.2d 1147, 1149 (Utah 1977). *Howells* asked whether attorney fees should be awarded to the recipient of a bad check. The defendant had written a dishonored check to pay on a past due account. The plaintiff claimed that attorney fees should be available because the act of passing the check constituted fraud. We rejected this claim because "the plaintiff was not induced to give anything of value, nor was it in any way cheated or adversely affected by the giving of the check." *Id.* We reasoned that payment of an antecedent debt was qualitatively different from a payment made for something of value, like the goods or services that were later subsumed within the indebtedness.

¶ 39 Our *Howells* reasoning is inapt here. Instead, our analysis relies on our traditional methods of statutory interpretation. "When interpreting statutes, we determine the statute's meaning by first looking to the statute's plain language, and give effect to the plain language unless the language is ambiguous." *Blackner v. State*, 2002 UT 44, ¶ 12, 48 P.3d 949. The plain language of the statute informs us that the key is the purpose for which the check is issued. If the check is issued in exchange for a thing of value, then the statute applies. The passage of time between the acquisition of the thing of value and the passing of the bad check, while relevant, is not the defining characteristic of purpose. To the contrary, little can be gleaned about the purpose of a bad check from merely knowing whether it was passed five seconds or five weeks after the thing of value changed hands. In short, the purpose for passing a bad check may be established without any evidence regarding when the check was passed relative to when the thing of value to which it is linked was acquired.

¶ 40 There is no evidence that Mr. Robison passed the checks to Mr. Painter for an antecedent debt. The only evidence is that the checks were passed in payment for the truck. The truck was turned over to Mr. Robison contingent on his customer's approval and the subsequent payment of the purchase price to Mr. Painter. The truck was not exchanged for a debt on which Mr. Robison would make subsequent payments or even a single subsequent payment—everything in the record suggests that Mr. Painter relinquished ownership of the truck in exchange for the issuance of full payment from Mr. Robison. To interject the additional step of debt creation when no such arrangement was contemplated is nonsensical and defeats the purpose of the statute. The actual transaction, therefore, did not occur when Mr. Robison first drove off in the truck. Rather, it took place when Mr. Robison told Mr. Painter that his customer was indeed

going to purchase the truck, at which point there was an understanding that Mr. Robison would pay for the truck. In other words, the transaction was premised on the understanding that a check would issue in exchange for the truck. Whether Mr. Robison wrote out a check and handed it to Mr. Painter at that instant or waited an indefinite period of time and then mailed Mr. Painter a check is irrelevant. Mr. Robison would not have obtained the truck if Mr. Painter had not known or assumed that payment would be made. Consequently, the check was indeed issued for the purpose of obtaining the truck, and the district court's decision was correct.

## CONCLUSION

¶ 41 We hold that the court of appeals erred in reversing the district court on a legal theory that had not been preserved, briefed, or argued. Upon discovering a dispositive legal theory that has not been presented and facing a case which would result in a "great and manifest injustice" if that unargued legal theory were not applied, an intermediate appellate court should give the parties the opportunity to present arguments before issuing a decision based on that theory. We also hold that Utah's bad check statute does not require a "substantially contemporaneous exchange."

¶ 42 Therefore, we reverse the court of appeals and remand for consideration of the merits, if any, of Mr. Robison's remaining rule 11 claims.

¶ 43 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.