2009 UT App 79

**John NIKOLS, Plaintiff and Appellant,**

v.

**GOODMAN & CHESNOFF, a Nevada corporation; and David Z. Chesnoff, Defendants and Appellees.**

No. 20080503–CA.

Court of Appeals of Utah.

March 19, 2009.

Gregory G. Skordas and Rebecca C. Hyde, Salt Lake City, for Appellant.

Scott O. Mercer and Ryan B. Hancey, Salt Lake City, for Appellees.

Before Judges BENCH, DAVIS, and McHUGH.

## OPINION

BENCH, Judge:

¶ 1 Plaintiff John Nikols appeals from the trial court's denial of his motions to discharge writs of attachment against four properties that were legally titled in his son's name. We affirm because Plaintiff failed to establish the existence of a purchase money resulting trust in his favor by clear and convincing evidence.

## BACKGROUND

¶ 2 At the center of this controversy are four parcels of land (the Properties) legally titled in the name of Plaintiff's adult son, Michael Nikols (Son). It is undisputed that Plaintiff purchased the Properties between 1988 and 1994 and titled them in Son's name. In 2007, the law firm Goodman & Chesnoff obtained a judgment against Son for unpaid legal fees resulting from David Chesnoff's (Chesnoff) representation of Son, who was facing federal drug charges. Chesnoff also sought and obtained writs of attachment against the Properties.

¶ 3 Plaintiff initiated this action against Chesnoff, alleging that Plaintiff was the owner of the Properties and requesting that the trial court discharge the writs of attachment. Claiming that he was the only party burdened and benefitted by the Properties and that he never intended the legal transfer of title to Son as a gift, Plaintiff asked the trial court to rule that a purchase money resulting trust existed in his favor.

¶ 4 The trial court held an evidentiary hearing to give Plaintiff an opportunity to present evidence relating to his claim of equitable ownership through a purchase money resulting trust. At that hearing, Plaintiff presented only his own testimony as evidence that a purchase money resulting trust existed in his favor. He explained how he funded the purchases and stated that he titled the Properties in Son's name to expedite the purchases in light of Plaintiff's own credit problems. Plaintiff also stipulated to facts concerning his previous debts and creditors that were inconsistent with statements he had made to the trial court at the initial hearing. The stipulation made it clear that the credit problems allegedly causing Plaintiff to title the Properties in Son's name were not resolved until several years after the timing Plaintiff had initially represented.[1]

¶ 5 Neither Son nor Chesnoff testified. Son understandably did not want to run the risk of incriminating himself if subjected to cross-examination. Chesnoff was willing to take the stand but did not do so at the request of Plaintiff, who did not want Chesnoff to disclose information concerning the federal charges facing Son. The trial court ultimately refrained from prospectively ruling that the testimony of Chesnoff and Son could be limited, indicating that those issues could only be resolved once the witnesses took the stand.

¶ 6 The trial court ruled that without any corroborating evidence, Plaintiff's own testimony was insufficient to persuade the court that a purchase money resulting trust had been created. The trial court considered the length of time during which the Properties remained in Son's name, as well as the inconsistent statements Plaintiff had made at the previous hearing, as support for its conclusion. The trial court concluded that Plaintiff had failed to establish that he owned the Properties at the time Chesnoff attached them. Plaintiff now appeals the trial court's ruling.

## ISSUES AND STANDARDS OF REVIEW

¶ 7 Plaintiff asks us to reverse the trial court's ruling that the Properties remain subject to execution of the previous judgment against Son. In cases involving equitable issues such as a resulting trust, "we will not disturb the trial court's findings of facts unless the evidence clearly preponderates against [them]." *Zion's First Nat'l Bank v. Fennemore (In re Estate of Hock)*, 655 P.2d 1111, 1114 (Utah 1982); *see also Jacobson v. Jacobson*, 557 P.2d 156, 158 (Utah 1976) (acknowledging the trial court's "advantaged position" and giving a trial court's findings and judgment "considerable deference" in cases where a party is attempting to reform a deed). We will "assess the quality and quantity of the evidence to determine whether it

---

1. Plaintiff's testimony and the stipulation reached by the parties raise factual questions as to what Plaintiff's motivations were in titling the Properties in Son's name. The trial court has not determined, factually, whether Plaintiff's actions were indeed an attempt to defraud his creditors and whether such fraud actually oc- curred. Furthermore, even if we assume that Plaintiff intended to defraud his creditors, Chesnoff is clearly not one of Plaintiff's creditors. Deciding the case on the doctrine of unclean hands would therefore necessitate several levels of analysis not addressed below.

'clearly preponderates against' the trial court's [determination] that the appropriate standard of proof has been satisfied." *In re Estate of Hock,* 655 P.2d at 1114 n. 1.

## ANALYSIS

¶ 8 Plaintiff claims that the evidence he presented was sufficient to establish the existence of a resulting trust in his favor and, as a result, that Chesnoff should be precluded from satisfying Son's debt by executing the writs of attachment against the Properties. "[A] purchase money resulting trust is an equitable remedy designed to implement what the law assumes to be the intentions of the putative trustor." *Id.* at 1114. According to the Restatement (Second) of Trusts, a purchase money resulting trust is presumptively created "where a transfer of property is made to one person and the purchase price is paid by another." Restatement (Second) of Trusts § 440 (1959). However, where the "transferee is a wife, child or other natural object of bounty of the person by whom the purchase price is paid, [the presumption is that] a resulting trust does not arise unless the [payor] manifests an intention that the transferee should not have the beneficial interest in the property." *Id.* § 442.

¶ 9 The Utah Supreme Court requires a party that seeks to alter or rebut a deed or other such document to do so by clear and convincing evidence. *See In re Estate of Hock,* 655 P.2d at 1114; *Jacobson,* 557 P.2d at 158; *Northcrest, Inc. v. Walker Bank & Trust Co.,* 122 Utah 268, 248 P.2d 692, 693 (1952) ("[O]ne who asserts the invalidity of a deed must so prove by clear and convincing evidence."). Because Plaintiff's efforts to have the writs discharged attempt to avoid the legal significance of the deed to the Properties, he must prove his alleged purchase money resulting trust by clear and convincing evidence.

### I. Sufficiency of the Evidence

¶ 10 The evidence that Plaintiff presented at the evidentiary hearing consisted almost entirely of his own testimony. Plaintiff testified concerning his intent in titling the Properties in Son's name, and on appeal, Plaintiff claims that he successfully created a prima facie case that a valid purchase money resulting trust existed in his favor. This prima facie argument mistakes the effect of this evidence on Plaintiff's ultimate burden to prove, by clear and convincing evidence, the existence of the purchase money resulting trust. Plaintiff cannot alleviate himself of his ultimate burden of proof by merely presenting some evidence in support of his claim. Plaintiff bears the responsibility to prove the existence of the purchase money resulting trust by clear and convincing evidence, which has been repeatedly described by Utah case law as evidence demonstrating "that there is no serious or substantial doubt as to the correctness of the conclusion." *See Northcrest,* 248 P.2d at 698.

¶ 11 For multiple reasons reflected in the record, the trial court concluded that Plaintiff failed to meet his burden and did not sufficiently establish the existence of a purchase money resulting trust. The trial court considered the length of time that the Properties remained in Son's name after the purported reasons for the transfer had long since expired. Other things considered by the trial court included the inconsistencies between statements Plaintiff made prior to and at the evidentiary hearing, and the lack of corroboration of Plaintiff's testimony. Given the high standard of proof required to make Plaintiff's case, we cannot say that the evidence Plaintiff presented clearly preponderates against the trial court's ruling. The quality and quantity of Plaintiff's evidence does not meet the "minimum standards of being clear and convincing." *See Sine v. Harper,* 118 Utah 415, 222 P.2d 571, 581 (1950); *see also id.* ("[W]e are required to determine whether within a rather restricted zone the evidence is sufficient to satisfy us that the trial judge could ... reasonably find that the evidence was both quantitatively and qualitatively sufficient to be clear and convincing.").

### II. Absence of Other Testimony

¶ 12 Plaintiff further claims that the trial court improperly precluded Son from testifying at the hearing. The record, however, indicates that the trial court did not prevent any party or witness from testifying. The

trial court did engage the parties in a forty-page discussion of the potential admissibility of Chesnoff's and Son's hypothetical testimonies. Some of that lengthy discussion could, if isolated from the whole, suggest that the trial court might have forced Son to entirely waive his Fifth Amendment rights in order to testify. When reviewed in context, however, the transcript reveals that the trial court was merely trying to explain that the answers to the parties' hypothetical questions of admissibility and the right to invoke the Fifth Amendment could not be answered definitively until the parties "got into the middle of it." The trial court wanted and needed to hear the specific cross-examination questions and to consider all the facts before it could rule.

¶ 13 The trial court's reticence to rule in the abstract comports with Utah case law regarding a witness's invocation of the Fifth Amendment. "Except in unusual circumstances, the privilege against self-incrimination must be invoked in response to each specific question propounded or document or other physical evidence sought.... It may not generally be asserted as a blanket response to all discovery." *First Fed. Sav. & Loan Ass'n v. Schamanek*, 684 P.2d 1257, 1262 (Utah 1984). Other cases have similarly treated a potential witness's Fifth Amendment protections, ruling that a trial court should not prematurely concern itself with potential invocations of the protections. *See State v. Schreuder*, 712 P.2d 264, 274 (Utah 1985) (holding that the Fifth Amendment "'comes into operation only where a specific question is asked'" (quoting *State v. White*, 671 P.2d 191, 193 (Utah 1983))); *see also Schamanek*, 684 P.2d at 1263 (stating that a trial court should not deny the Fifth Amendment privilege without first carefully considering "'all the circumstances in the case'" (quoting *Hoffman v. United States*, 341 U.S. 479, 488, 71 S.Ct. 814, 95 L.Ed. 1118 (1951))).

¶ 14 Here, the record demonstrates that the trial court was skeptical about the propriety of Son evading all of the questions opposing counsel might seek to ask by invoking the Fifth Amendment. However, Son never took the stand and did not refuse to answer any specific questions. Plaintiff was therefore not entitled to a ruling on the issue. "The strong judicial policy against giving advisory opinions" likewise precludes us from ruling on the ultimate propriety of any of the potential testimony in this case. *See Merhish v. H.A. Folsom & Assocs.*, 646 P.2d 731, 732 (Utah 1982). The trial court did not improperly preclude anyone from testifying. Its lengthy dialogue with the parties simply explored—prior to the need for an actual ruling—what topics might be allowed on cross-examination. Ultimately, the trial court left it to the parties to decide who would take the stand.[2]

## CONCLUSION

¶ 15 Although Plaintiff presented some evidence at the hearing in support of his claim, the trial court did not err in concluding that Plaintiff failed to establish a purchase money resulting trust by the requisite clear and convincing evidence. Plaintiff's own self-serving testimony simply did not stand up under the weight of the high standard of proof he was required to meet. The trial court's discussion concerning the admissibility of hypothetical testimony from Chesnoff and Son, as well as the potential Fifth Amendment implications arising therefrom, did not improperly prevent any party or witness from testifying.

¶ 16 We therefore affirm the decision of the trial court.

McHUGH, Judge (concurring in result):

¶ 17 Although I am troubled by the trial court's restrictions on Son's invocation of the Fifth Amendment, I do not believe we need to reach that issue. *See generally Citizens for Responsible Transp. v. Draper City*, 2008 UT 43, ¶ 15, 190 P.3d 1245 (holding that an appellate court should "avoid addressing constitutional issues unless required to do so" (internal quotation marks omitted)).

---

2. The issue of Chesnoff's potential testimony was also resolved in a way that did not require a direct ruling from the trial court: Chesnoff acquiesced to Plaintiff's own request that he not testify after Chesnoff made it clear that his testimony could do damage to Son's defense of the pending federal charges.

¶ 18 Plaintiff admitted in the trial court and on appeal that he placed the Properties in Son's name for the express purpose of avoiding his creditors. Where that fact is not in dispute, I believe this court may rely on it even in the absence of a specific finding by the trial court. In *Gardner v. Gardner*, 748 P.2d 1076 (Utah 1988), the Utah Supreme Court explained, "Failure of the trial court to make findings on all material issues is reversible error *unless the facts in the record are clear, uncontroverted, and capable of supporting only a finding in favor of the judgment." Id.* at 1078 (emphasis added) (internal quotation marks omitted). The fact that Plaintiff's purpose in titling the Properties in Son's name was to avoid creditors meets this test.

¶ 19 Thus, I would hold that Plaintiff is not entitled to the equitable protections of a purchase money resulting trust. *See Horton v. Horton*, 695 P.2d 102, 107 (Utah 1984) ("It is generally accepted that he who seeks equity must do equity."); *Hone v. Hone*, 2004 UT App 241, ¶ 7, 95 P.3d 1221 ("[A] party who seeks an equitable remedy must have acted in good faith and not in violation of equitable principles."). Furthermore, I see nothing that would limit the prerequisite of clean hands to situations where the party raising the defense is part of the class of persons defrauded by the party now seeking equity. *See Jacobson v. Jacobson*, 557 P.2d 156, 158 (Utah 1976) (noting that a plaintiff "who has engaged in fraud or deceit *in the business under consideration*" will be denied equity (emphasis added)). Here, the business under consideration is Plaintiff's placement of title to the Properties in the name of Son to avoid Plaintiff's creditors.

¶ 20 The Restatement (Second) of Trusts addresses that very issue, stating,

Where a transfer of property is made to one person and another pays the purchase price in order to accomplish an illegal purpose, a resulting trust does not arise if the policy against unjust enrichment of the transferee is outweighed by the policy against giving relief to a person who has entered into an illegal transaction.

Restatement (Second) of Trusts § 444 (1959). More specifically, the comments to section 444 state, "The most common situation in which the principle stated in this Section is applied is that in which the purchaser of property takes title in the name of another for the purpose of defrauding his creditors." *Id.* § 444 cmt. b. There is no dispute that Plaintiff took title to the Properties in the name of Son to defraud his creditors. Consequently, a resulting trust could not arise.

¶ 21 For these reasons, I would affirm the decision of the trial court. *See generally Ockey v. Lehmer*, 2008 UT 37, ¶ 42, 189 P.3d 51 ("[O]n appeal, we may affirm the district court 'on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the [district] court.'" (second alteration in original) (quoting *State v. Robison*, 2006 UT 65, ¶ 19, 147 P.3d 448)).

DAVIS, Judge (dissenting):

¶ 22 I respectfully dissent. I agree with the lead opinion's statement of the law regarding the invocation of the Fifth Amendment privilege. I do not, however, agree with the lead opinion's characterization of the trial court's treatment of Son's and Chesnoff's possible testimony—i.e., that "[t]he trial court wanted and needed to hear the specific cross-examination questions and to consider all the facts before it could rule," *supra* ¶ 12.

¶ 23 The trial court told Son that should he choose to testify and then invoke his Fifth Amendment privilege in response to any question, the entirety of his testimony—without regard to the specific questions asked—would be stricken:

[DEFENDANTS' ATTORNEY]: Your Honor, I would like to address the Court on a problem with an issue that has occurred to me during the break. There's been a proffer of testimony of [Son], and the Court's asking me if I would like to cross-examine him. I would, but if I do so, his credibility has already come into question in this court, and I fully intend to question him about his credibility and his involvement with drugs.

Now, I took his deposition earlier, and he claimed the Fifth Amendment in that

regard. I can't have a situation where there's a proffer of testimony by [Son] that I'm not able to get into any questions about his credibility because he refuses to answer. That makes it impossible—

THE COURT: Well, I will—I'll assume that the proffer is a waiver. If it isn't, then I'll disregard the proffer.

[DEFENDANTS' ATTORNEY]: Can we get an answer on that?

[PLAINTIFF'S ATTORNEY]: Yes, Your Honor. I think those are two entirely separate issues. The proffer has to do with what his understanding was at the time that [the Properties]—

THE COURT: He has to be willing to get on the stand and testify and be subject to cross-examination. I'm not going to limit cross-examination to just the proffer, because I think credibility is an issue.

[PLAINTIFF'S ATTORNEY]: Your Honor, I believe that his—he's not required to choose between making the proffer of testimony with respect to the conveyance of [the Properties]—

THE COURT: I'm going to disregard the proffer. I'm going to disregard his proffer if he won't testify and subject himself to cross-examination. Now—so, I mean, you can—you may not think that that's a choice that you want to have him make, but that's what I'm saying. And if you want some time to think about it, fine. If you don't fine.

[PLAINTIFF'S ATTORNEY]: No, Your Honor. I'd just like the benefit of the record to put my objection on the record, if I may, please.

THE COURT: Okay. Go ahead.

[PLAINTIFF'S ATTORNEY]: My objection would be as follows:

The proffer of testimony has to do with the conveyance of [the Properties] and the intent behind the conveyance of [the Properties] in 1988 and 1994.

[Defense counsel] could certainly cross-examine with respect to credibility on the issue of whether or not [Son] is currently facing felony charges. [Son] is not convicted of any felony charges, and under Rule 608 and 609, that wouldn't be admissible.

There's no other relevant inquiry into credibility other than the fact that he's charged. In order to—we shouldn't have to choose between him putting on testimony that's completely unrelated to the federal charges and a complete waiver of his Fifth Amendment privilege against self-incrimination with respect to the substantive criminal charges.

And that's just the only record that I would make on that regard, Your Honor.

THE COURT: All right. Well—

[PLAINTIFF'S ATTORNEY]: Let me consult with [Son] for just a moment, if I could, if that's the option we're going to give him.

[DEFENDANTS' ATTORNEY]: In this regard, I don't think [Plaintiff's attorney] is [Son's] lawyer.

[PLAINTIFF'S ATTORNEY]: [I'm] not, Your Honor. But—

THE COURT: Well, you might be careful, then, about what you talk to him about.

[DEFENDANTS' ATTORNEY]: I think he can address the Court. It would be by way of testimony. And if he does, he's waiving his Fifth Amendment right.

[PLAINTIFF'S ATTORNEY]: Actually, I think he's asking for a clarification. As [defense counsel] pointed out, you're right, I don't represent [Son] anymore. He's asking for clarification of the order.

THE COURT: What do you want to know, [Son]?

[SON]: I just wanted to know, Your Honor, if I do get on that stand and testify and I feel that there's something that might infringe upon what I believe is my rights, my Fifth Amendment rights, and I refuse to answer that, are you going to hold me in contempt of court or—or is that an option that I still have? And if—

THE COURT: Well, I'm not going to let you or [Plaintiff's attorney] pick and choose the subjects that you're going to testify about. If you testify *at all* and—and then—on some issues and then try to claim the Fifth Amendment on *other* issues, I'm going to disregard *all* of your testimony. So that's—that's my ruling. So . . .

[SON]: Then I would have to not.

THE COURT: All right. Then I'm going to disregard the proffer with respect to [Son].

(ellipsis in original) (emphasis added). This is the *entirety* of the discussion between the time when the issue was raised and when Son decided not to take the witness stand and effectively waive his Fifth Amendment rights.

¶ 24 Moreover, the trial court's comment that "we won't know the answer to that until we're right in the middle of it" had nothing to do with the determination of whether Son could testify but was made in response to Plaintiff's attorney stating that she believed that Chesnoff could quite easily talk about the statements Son made to him without talking about Son's federal drug charges.[1] Further, just two statements later, the trial court again referenced the fact that it wanted all or nothing from the witnesses' testimony, stating, "I've got to hear the whole—the whole ball of wax or none of it." And certainly the parties interpreted the trial court's comments as I do, for thereafter Plaintiff's attorney argued that she was "stuck with an all-or-nothing proposition," stating, "I don't want to lose by virtue of the fact that I've been put in a Catch 22, a lose/lose proposition where either [Chesnoff] gets to testify and rebut my evidence [or Plaintiff] and [Son] have to swallow a bitter pill and, suddenly, there's going to be testimony that will be used against [Son] in a criminal proceeding." And Defendants' attorney effectively recognized the all-or-nothing choice that Son had been forced to make when he argued against postponement by stating, "[Son] has said, unequivocally, 'I will not get on the witness stand. I will not waive my Fifth Amendment right,' case over."

¶ 25 Thus, considering the trial court's all-or-nothing approach, making its determination regarding the exercise of Son's Fifth Amendment rights without allowing any specific questions to be asked, I think the trial

court's ruling was in error. Indeed, this approach left us in the very position of which the lead opinion complains, i.e., that without the witnesses taking the stand we have no specific questions to evaluate, *see supra* ¶ 14. I would therefore reverse on this issue and remand for a new trial.

1. I think it is somewhat misleading to state that Chesnoff was willing to take the stand but ultimately "acquiesced" to Plaintiff's request that he not testify, *see supra* ¶ 5 and note 2. It is clear that it was in Chesnoff's best interest to avoid testifying that he had previously stated on the record during Son's federal criminal proceedings that the Properties belonged to Plaintiff. And Chesnoff's counsel vigorously worked to create a situation whereby such testimony would come in only at great cost to Son.